STATE OF NORTH CAROLINA v. ARTHUR MARTIN BOYD, JR.

No. 177A83

(Filed 28 August 1984)

1. **Criminal Law § 102.6— accountability of jury to witnesses and society—improper jury argument—no prejudicial error**

    Although the prosecutor's jury argument concerning the jury's accountability to the witnesses, the victim, the community and society and how it would respond to such persons if the verdict was for less than first-degree murder is disapproved, it did not amount to such gross impropriety as to require the trial judge to act *ex mero motu*. Furthermore, any impropriety in the prosecutor's remarks was not prejudicial in light of the ample support in the record for defendant's conviction of first-degree murder.

2. **Criminal Law § 135.6— sentencing hearing for first-degree murder—exclusion of testimony concerning effect of stressful life events**

    In a sentencing hearing in a first-degree murder case, the trial court did not err in excluding testimony by a college teacher of criminology concerning stressful life events and criminal homicide which tended to show that stressful events in defendant's life history typified that of a man likely to murder a family member or close friend where defendant's entire life history was before the jury, and each of the stressful events in defendant's life was submitted to the jury as a mitigating circumstance, since the witness's testimony would not have added credibility to any of the individual mitigating factors considered by the jury.

3. **Criminal Law § 102.9— jury argument—comment on credibility of defendant and witnesses**

    In a sentencing hearing for first-degree murder, comments made by the prosecutor impugning the character of defendant and the credibility of defendant and his witnesses were based upon the evidence or upon inferences properly drawn therefrom.

4. **Criminal Law § 135.9— first-degree murder—sentencing hearing—argument concerning weight of mitigating factors**

    In a sentencing hearing for first-degree murder, the prosecutor's argument to the jury that "even though you find [the mitigating factors] to exist, you may not accord them any weight in mitigation" was not improper when taken in the context of the prosecutor's careful discussion of each of the mitigating factors and the instructions by the trial judge.

5. **Criminal Law § 102.6— jury argument—personal opinion—no gross impropriety**

    Although the prosecutor may have injected his personal opinion in stating that the Bible may be "the very best law book we have got," such statement was not grossly improper.

State v. Boyd

**6. Criminal Law §§ 102.12, 135.4 — jury argument — statement from overruled case**

In a sentencing hearing for first-degree murder, the prosecutor did not violate G.S. 84-14 or commit a gross impropriety in quoting a statement from *State v. Jarrette,* 284 N.C. 625, concerning the deterrent effect of a sentence of death although that case was overruled by a U. S. Supreme Court decision which invalidated the capital sentencing scheme as it existed at that time.

**7. Criminal Law § 135.9 — first-degree murder — sentencing hearing — mitigating factors — findings by jury**

In a sentencing hearing for first-degree murder, the trial court did not err in instructing the jury that it could but was not compelled to answer "yes" or "no" to each of the mitigating factors that were submitted but was required only to indicate, as the third issue, whether it found one or more mitigating factors to exist.

**8. Criminal Law § 135.9 — first-degree murder — sentencing hearing — instructions on mitigating factor — use of "could"**

The trial court's instruction in its final mandate in a sentencing hearing for first-degree murder that the jury "could" answer an issue as to a mitigating factor in defendant's favor was not plain error where the court used the mandatory "would" or "should" in other portions of the instructions on such mitigating factor.

**9. Criminal Law § 135.9 — first-degree murder — sentencing hearing — mental or emotional disturbance — instruction referring to "faculties"**

In a sentencing hearing for first-degree murder, the trial court did not err in using the term "loss of faculties" in its instructions to the jury on the mitigating circumstance as to whether defendant was under the influence of mental or emotional disturbance.

**10. Criminal Law § 114.3 — first-degree murder — sentencing hearing — instructions on mitigating factors — no expression of opinion**

The trial judge did not express his opinion on the credibility of defendant's witnesses and the evidence while instructing the jury on the mitigating factors in a sentencing hearing for first-degree murder.

**11. Criminal Law § 135.7 — first-degree murder — sentencing hearing — instructions — burden of proof — duty to return death penalty**

The trial court did not err in failing to instruct the jury that the State had the burden of proving beyond a reasonable doubt that the aggravating circumstances substantially outweighed the mitigating circumstances sufficiently to call for the death penalty or in instructing the jury that it must return a verdict of death if it found that the aggravating circumstances outweighed the mitigating circumstances.

**12. Constitutional Law § 63; Criminal Law § 135.3 — death qualification of jury — propriety**

Death qualifying a jury prior to the guilt phase does not result in a jury which is guilt and death prone.

**13. Constitutional Law § 63; Criminal Law § 135.3— exclusion of veniremen opposed to death penalty**

Two jurors were not improperly excluded from the jury panel in a first-degree murder case in violation of the *Witherspoon* rule where they both stated that they could not impose a sentence of death.

**14. Criminal Law § 135.7— first-degree murder—sentencing hearing—effect of jury's inability to agree—instruction not required**

The trial court did not err in failing to instruct the jury during the penalty phase of a first-degree murder case that a sentence of life imprisonment would be imposed if the jury was deadlocked upon the proper sentence.

**15. Criminal Law § 135.8— constitutionality of heinous, atrocious or cruel aggravating circumstance**

The "especially heinous, atrocious, or cruel" aggravating circumstance of G.S. 15A-2000(e)(9) is not unconstitutionally vague on its face as construed and applied in North Carolina.

**16. Criminal Law § 135.9— mitigating circumstances—burden of proof**

A defendant in a sentencing hearing for first-degree murder was not denied due process because the trial court placed the burden on him to prove the mitigating circumstances by a preponderance of the evidence.

**17. Criminal Law § 135.4— constitutionality of capital murder scheme**

The North Carolina capital murder scheme does not unconstitutionally permit subjective discretion and discrimination in imposing the death penalty.

**18. Criminal Law § 135.4— constitutionality of death penalty statute**

The North Carolina death penalty statute, G.S. 15A-2000, is not unconstitutional.

**19. Criminal Law § 135.10— proportionality of death sentence**

A sentence of death imposed upon defendant for the first-degree murder of his former girl friend was not excessive or disproportionate where the victim was stabbed 37 times and suffered considerably prior to her death.

Justice EXUM dissenting as to sentence.

Justice MARTIN joins in this dissenting opinion.

BEFORE *Washington, J.,* at the 14 March 1983 Criminal Session of Superior Court, SURRY County, defendant was convicted of first degree murder and sentenced to death, from which sentence he appeals as a matter of right. N.C. Gen. Stat. § 7A-27(a). This case was heard in the Supreme Court on 10 May 1984.

Defendant was tried for and convicted of the first degree murder of Wanda Phillips Hartman. The victim died as a result of thirty-seven stab wounds inflicted by the defendant. Numerous in-

dividuals, including the victim's mother and young daughter, witnessed the murder which occurred outside a shopping mall on the afternoon of Saturday, 7 August 1982. Because the evidence at trial pointed unerringly to the defendant as the perpetrator of the crime, the focus at the guilt phase of the trial was whether the evidence was sufficient to support a conviction of first degree murder on the theory of premeditation and deliberation. Defense counsel argued forcefully that if guilty, defendant could at most be convicted of second degree murder. Also because of the overwhelming evidence of defendant's guilt, defense counsel has prudently raised and argued only one assignment of error respecting the guilt phase of the trial: whether the defendant was deprived of his right to a fair trial by jury as a result of the prosecutor's argument "which sought a conviction of first degree murder on the basis of passion and prejudice rather than the evidence offered at trial." As our discussion of the facts will reveal, although we do not approve of the prosecutor's remarks, the evidence at trial was more than sufficient to support a conviction for first degree murder. Therefore, defendant has failed to show prejudice by any impropriety, particularly as he failed to object during the argument.

Defendant's remaining assignments of error relate to the sentencing phase of his trial. These include numerous assignments of error on issues previously resolved by this Court against the defendant and which have been raised to preserve these issues for further appellate review. In addition, defendant challenges the trial court's exclusion of certain testimony relating to his mental condition, the prosecutor's remarks during argument to the jury, and the instructions on mitigating factors.

Upon our careful reading of the trial transcript and upon full consideration of the arguments set forth in the briefs, we find that no prejudicial error occurred at either the guilt phase or the sentencing phase of defendant's trial. We therefore affirm the conviction of first degree murder and the sentence imposed thereon.

In order to address the assignments of error raised on this appeal, it is necessary to set out a full and detailed statement of the facts.

The defendant had known the victim for approximately three years during which time they had lived together. They had sep-

arated several months prior to the murder when the victim and her daughter moved into the home of the victim's parents. The defendant returned to his wife and children while at the same time attempting a reconciliation with the victim. On the morning of Saturday, 7 August 1982, defendant was seen drinking at a local tavern. He then took a taxi to the Mayberry Shopping Mall in Mount Airy where he bought a lock-blade knife, the murder weapon. He met the victim coming out of a store accompanied by her mother and daughter. He followed the victim to a nearby bank where a local church group was conducting a carwash. The victim's father was the pastor of the church. Witnesses, including the man who sold defendant the knife, described the defendant as calm, polite and not intoxicated. He told one witness that he had "never felt better in his life" and shook hands with the victim's father, stating that he had no hard feelings. This latter remark was apparently in reference to the fact that the victim's father had earlier in the week ordered defendant from his property after which a trespassing warrant had been issued. Defendant and the victim then sat on the curb in front of the bank and talked quietly for some period of time until the victim's mother stated that they had to leave. As the victim stood up, the defendant stood in front of her and asked that she talk to him a little longer. The victim stated that they had nothing further to discuss and that if the defendant was going to kill her, "he should hurry up and get it over with." Of significance was the fact that approximately one week prior to the murder, during a confrontation with the victim's father, defendant turned to the victim and stated "I'll see you like a German submarine, when you are not expecting it." Defendant reached into his pocket, pulled out the knife and assured the victim that he wasn't going to hurt her. He immediately drew back the knife and stabbed her. The victim fell to the ground and the defendant continued to stab her as rapidly as he could. At one point the victim's mother managed to pull the defendant away from her daughter. Defendant, however, pushed the 76 year old woman aside, held the victim by her hair, and continued to stab.

One of the eyewitnesses, a member of a Virginia County Sheriff's Department who was visiting Mount Airy with his son, followed the defendant on foot after the murder. He watched as the defendant walked slowly and inconspicuously from the crime

scene toward the back of the shopping mall. Defendant removed his bloodstained shirt, wiped the blood from his hands, and put the shirt into his back pocket. Defendant eventually reached an embankment, turned, and headed for the mall parking lot as a Mount Airy police car reached the scene. Defendant tossed the knife under a parked car and attempted to conceal himself between other cars. He was apprehended and arrested.

The testimony indicated that the victim suffered considerably prior to her death. When the emergency medical unit arrived at the scene at 2:25 p.m., she was "raking [her hands] back and forth in the dirt," and repeatedly complained of an inability to breathe. She was taken to a local hospital for emergency treatment and then sent by ambulance to Baptist Hospital in Winston-Salem. She died en route at 3:45 p.m. The examining pathologist testified that he identified thirty-seven stab wounds to the neck, chest, left arm, left thigh, back, and each hand, that included two penetrating wounds to the right lung, three to the left lung, one to the stomach and one to the sternum. The wounds to the hands and arm were classified as defensive wounds—"incision wounds which are produced when the victim extends its arms in an effort to defend himself." The victim died of exsanguination caused by multiple stab wounds, leading to hypovolemic shock.

Defendant did not testify at the guilt phase of his trial. He presented three witnesses in an effort to prove he was intoxicated at the time of the murder. Two friends testified that defendant spent the morning at Martin's Place, during which time he allegedly consumed much beer, some whiskey and took some undisclosed type of pill, variously described as "heartshaped" or a large "black capsule" which the defendant removed from his hat. The bartender, however, did not recall seeing the defendant wearing any hat, and testified that defendant left the tavern at 9:30 a.m., soon after he had arrived. The bartender did testify that when defendant returned shortly after noon, she refused to serve him because he appeared to be intoxicated.

At the sentencing phase of the trial, the defendant testified on his own behalf and offered the testimony of a number of preachers who had witnessed defendant's religious rebirth, and his mother who testified concerning defendant's distressing childhood. The thrust of this testimony was that defendant's

father abandoned the family when defendant was a child. Then, defendant's grandfather, to whom he looked as a father figure, died. This event was likened to a dog losing its master. Defendant had a history of alcohol abuse. From the age of fourteen the defendant had either been in prison, on parole, or on probation for crimes including injury to property, nonsupport, seven convictions for larceny, assault with intent to commit rape on a fourteen year old girl, driving under the influence, assault on an officer, and resisting arrest. Prior to the murder he was on an antiabuse program which required him to take a pill before a magistrate each day. He voluntarily stopped the program the day before the murder.

The defendant loved the victim and attempted in every way he could to effect a reconciliation. He had read her diary and knew she was seeing another man. He talked to her for two hours on the telephone on the morning of the murder and knew she would be at the Mayberry Mall for the carwash. In violation of his probation, he had been arrested for driving under the influence earlier in the week and had consulted his attorney the day before the murder. He recalled the details of his activities prior to and following the murder, but did not recall the actual murder.

On Tuesday, 21 December 1982, at 8:30 p.m. defendant experienced a religious awakening. He was permitted to leave prison for his baptism which took place on 15 January 1983 at Holder's Bottom. He has since become an ardent student of biblical literature and was described by one of the preachers who testified on his behalf as "smart. A lot of people don't know how to be saved, and he does." Defendant testified that Jesus Christ "picked me up out of the hog pen," and that "[w]hat you see sitting right here in front of you is sin." "I am guilty, all right, but I have been forgiven for that sin, and that's satisfied me." Twice, each time prior to when the case was scheduled for trial, defendant wrote the victim's father asking for forgiveness and in one letter stated "The D.A. has asked for my life to be taken away. I'm worried about that. — I do not think that would make anyone feel better."

Against this background, defendant attempted to introduce at the sentencing phase the testimony of Jack Humphrey, co-author of a report entitled "Stressful Life Events and Criminal Homicide." Following the State's objection, the trial judge con-

ducted a voir dire hearing which disclosed the following: The witness teaches criminology at U.N.C.-Greensboro. The witness had reviewed the prison records, social histories and psychiatric histories collected by the Department of Corrections for inmates over a two-year period. The study involved approximately 272 violent offenders and 193 felonious property offenders (non-violent offenders). The report concluded that homicide offenders tend to experience more stressful events than do non-homicide offenders over the course of their lifetime prior to the commission of the crime. In addition, people who tend to kill those close to them tend to experience more loss in their lives than those who kill strangers. "The more loss in someone's life, the more likely they are to become self-destructive. And it seems that killing a family member or killing a close friend is an act of self-destruction." The witness then described the types of "losses" which can be experienced:

1) Loss of a parent or sibling

2) Loss of a student role — being expelled from school

3) Loss of friends

4) Loss of job

5) Loss of liberty — being incarcerated.

The witness had interviewed the defendant and concluded that "what was true of the group of people who had killed someone close to them was especially true of Mr. Boyd." The defendant's father had abandoned the family; he had lost his grandfather; he was unable to keep a job; he had been incarcerated; he had few friends and those he had he kept losing.

Defense counsel argued that the testimony would give "some credence to the submission to the jury of any mitigating circumstance involving Mr. Boyd where he lost his father at an early age and he lost his grandfather at an early age." However, following the voir dire hearing, the trial judge excluded this evidence.

Following the presentation of evidence at the sentencing phase, the court submitted as factors in aggravation N.C. Gen. Stat. § 15A-2000(e)(2), that the defendant had been previously convicted of a felony involving the use or threat of violence to the

person; and N.C. Gen. Stat. § 15A-2000(e)(9), that the murder was especially heinous, atrocious, or cruel. The jury answered these issues in the affirmative, and found that the aggravating factors were sufficiently substantial to call for the imposition of the death penalty. The jury was asked to consider the following mitigating factors:

(1) That the murder was committed while Arthur Martin Boyd, Jr. was under the influence of mental or emotional disturbance.

(2) The capacity of Arthur Martin Boyd, Jr. to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

(3) The age of the defendant at the time of the crime.

(4) The defendant had lived with the deceased and at the time of the death of the deceased desired a reconciliation.

(5) The defendant has since the commission of the crime expressed remorse over the death of the deceased.

(6) The defendant knew and cared for the deceased.

(7) The defendant has since the commission of the offense asked the father of the deceased to forgive him.

(8) The defendant has since the commission of the offense expressed a devotion to God.

(9) The defendant has since the commission of the offense been baptized.

(10) The defendant suffered the loss of his grandfather at an early age in life.

(11) The father of the defendant abandoned the family at an early age in the life of the defendant.

(12) The defendant sought help from others before the commission of the crime.

(13) The defendant was addicted during most of his adult life to drugs and alcohol.

(14) Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value.

The jury did not indicate which mitigating circumstances it did or did not find, but affirmatively indicated that it found one or more. Finally, the jury found that the aggravating circumstances outweighed the mitigating circumstances and recommended a sentence of death.

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the State.*

*Ann B. Petersen and James R. Glover, Assistant Appellate Defenders, and Michael F. Royster, for the defendant appellant.*

COPELAND, Justice.

GUILT PHASE

I.

[1] Defendant first contends that he was denied a fair trial as a result of the prosecutor's remarks during closing argument at the guilt phase of the trial. He points specifically to the following statements:

. . . the reality of this case hit me.

We are talking about real people. By your verdict in this matter you are going to be saying to these real people what you think of what you have heard here this week. Your decision is going to tell those people what you think of what you heard here.

There are several people you will be answering to. What will you say to the people in this Country about what you have heard? What will you say about all those citizens out there in Surry County about what you have heard here this week? Will you say, "Okay, if it happened down there at Mayberry Mall on a Saturday"? Will you say "Okay"?

The prosecutor then went on to ask how the jury would respond to the witnesses, the paramedics, the victim, her parents, and her daughter if its verdict was for less than first degree murder.

As we most recently stated in *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197 (1984), a prosecuting attorney may argue vigorously all facts in evidence, the law raised by the issues, and any inferences arising therefrom. However, the prosecutor "may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence." *Id.* at 15, 316 S.E. 2d at 197. From this it follows that the jury's decision must be based solely on the evidence presented at trial and the law with respect thereto, and not upon the jury's perceived accountability to the witnesses, to the victim, to the community, or to society in general.

The defendant, however, failed to voice any objection at trial to the prosecutor's closing remarks. Therefore, this Court must determine whether the remarks amounted to such gross impropriety as to require the trial judge to act *ex mero motu. See State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197. Following a thorough review of the contested argument, we find that while we do not approve of the prosecutor's remarks, they do not rise to the level of such gross impropriety as to have required *ex mero motu* action by the trial judge. Furthermore, the record provides ample support for the defendant's first degree murder conviction despite the improper remarks. Therefore, any impropriety in the remarks was not prejudicial. In the absence of a showing of prejudice, prosecutorial misconduct in the form of improper jury argument does not require reversal. *See United States v. Hasting*, 461 U.S. 499, 76 L.Ed. 2d 96 (1983) (lower court erred in reversing conviction apparently on the basis that it had the supervisory power to discipline prosecutors for continuing violations of rule banning comment on accused's failure to testify, regardless of whether prosecutor's arguments constituted harmless error). *See also State v. Taylor*, 289 N.C. 223, 221 S.E. 2d 359 (1976); *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572 (1971).

PENALTY PHASE

II.

[2] Defendant contends that the trial court's exclusion of Dr. Humphrey's testimony concerning stressful life events and criminal homicide constituted prejudicial error. Defendant argues, *inter alia* that "[t]he purpose of Doctor Humphrey's testimony was

to link together all of the defendant's mitigating evidence into a unified whole which explained the apparent contradiction of killing the person the defendant loved the most." The defendant intended to show, through Dr. Humphrey's testimony, that the killing was "primarily a depression caused self-destructive act, closely related to the impulse that leads to suicide, resulting from a life history of an inordinate number of losses beginning with the abandonment by the defendant's father and the death of his grandfather and culminating with the threatened loss of Wanda Hartman." Defendant concludes that:

> Without the glue, the entire structure of the defendant's theory of mitigation was shattered into little pieces. Presented only as broken bits, there was virtually no hope that the defendant could convince the sentencing jury that his was a case arising out of the "frailties of human kind" which called for compassion and mitigation of the ultimate penalty of death.

The State argues that evidence of stress, as defined by an accumulation of "losses," most of which are merely manifestations of antisocial behavior, while perhaps resulting in crimes of violence, is of no mitigating value.

In its brief, the State comments that:

> The most Dr. Humphrey's study showed was that stress often times produces violent behavior in susceptible individuals and that persons incarcerated in the North Carolina Prison System for violent crimes have histories of more stress than those incarcerated for non-violent crimes. . . . It is common knowledge that millions of individuals have been subjected to some or all of the stresses inflicted upon defendant without becoming murderers. Many people lose their fathers and grandfathers at an early age and later in life experience marital problems or are rejected by a spouse or other loved one without becoming murderers. The stresses to which defendant was subjected were no more or less than those inflicted upon the population in general by life; the fact that he was weak and succumbed to these stresses hardly reduces his moral culpability or demonstrates that he is a less worthy candidate for capital punishment than another. Rather clearly the evidence shows a weak individual; the

product of an alcoholic father who deserted his family and a less than stable mother; who had gone to prison by the time he was seventeen years of age; who, in the ensuing twenty years, never kept a job for a year while being convicted of twelve crimes; who was taken to church regularly as a child but when not in prison, was high most of the time on drugs and alcohol and who spent all of his time in a pool hall as a hustler and crappie.

In determining whether Dr. Humphrey's testimony was erroneously excluded at the sentencing phase of defendant's trial as bearing on factors in mitigation, our inquiry is twofold: (1) whether the tendered evidence was relevant, and (2) whether defendant has demonstrated the existence of "patent, prejudicial error" by its exclusion. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982). In this regard, we stated in *Pinch* that:

> Defendant's contentions must be examined against the backdrop of our capital punishment statute which provides, in conformity with the constitutional mandates of the Eighth and Fourteenth Amendments, that any evidence may be presented at the separate sentencing hearing *which the court deems* "relevant to sentence" or "to have probative value," including matters related to aggravating or mitigating circumstances. G.S. 15A-2000(a)(3); *see Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978). The circumstances of the offense and the defendant's age, character, education, environment, habits, mentality, propensities and criminal record are generally relevant to mitigation; however, the ultimate issue concerning the admissibility of such evidence must still be decided by the presiding trial judge, and his decision is guided by the usual rules which exclude repetitive or unreliable evidence or that lacking an adequate foundation. *See State v. Johnson*, 298 N.C. 355, 367, 259 S.E. 2d 752, 760 (1979); *State v. Cherry*, 298 N.C. 86, 98-99, 257 S.E. 2d 551, 559 (1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed. 2d 796 (1980). *See also State v. Goodman*, 298 N.C. 1, 30-31, 257 S.E. 2d 569, 588 (1979). Consequently, we believe that a new sentencing hearing should not be ordered by this Court for the trial judge's exclusion of evidence at the penalty phase unless the defendant demonstrates the existence of patent, prejudicial error.

*Id.* at 19, 292 S.E. 2d at 219.

A mitigating circumstance has been defined as:

> "a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first-degree murder, which may be considered as extenuating, or reducing the moral culpability of killing or making it less deserving of the extreme punishment than other first-degree murders."

*State v. Brown,* 306 N.C. 151, 178, 293 S.E. 2d 569, 586 (1982).

We note first that Dr. Humphrey's report consists of only nine pages of narrative, three statistical charts, and three pages of references. The report, in the final paragraph of the summary, states:

> Support and qualification has been found for the link between stressful life events and criminal homicide. The findings also show that the type of stress typically experienced by the offender tends to influence his choice of victim.

In short, the report lacks comprehensiveness and is characterized by general conclusions of questionable scientific import or value in mitigation. In fact, the pertinent information we have concerning the details of the scientific and statistical methods which Dr. Humphrey and his co-author employed were gleaned from a thorough cross-examination of the witness during voir dire. Furthermore, the "stressful events" described by the witness as pertaining to the defendant—his loss of freedom due to incarceration, his inability to hold a job, and his problem maintaining friendships—offer little as factors which would extenuate or reduce the moral culpability of the killing. Nevertheless, each of these stressful events was presented to the jury in considerable detail through the testimony of the defendant, his mother, and other witnesses. Basically, defendant's entire life history was before the jury, including information about his alcoholic father, the death of his grandfather, his work history, his criminal history, his marital history, and his history of drug and alcohol abuse, together with his eventual religious conversion. Dr. Humphrey's testimony would have placed these various "stressful events" in a context suggesting that defendant's act in murdering Wanda Hartman was predictable. The report merely constructs a profile of a mur-

derer into which the defendant fits. The fact that the defendant's life history typifies that of a man likely to murder a family member or close friend would not, we believe, have added credibility to any of the individual mitigating factors which were supported by the evidence and considered by the jury. The trial judge did not err in excluding the testimony of Dr. Humphrey.

## III.

Defendant next contends that he is entitled to a new sentencing hearing because of several allegedly improper statements made by the prosecutor at the completion of the sentencing phase of the trial. The defendant's exceptions pertain to remarks regarding (1) the defendant's character and credibility; (2) the credibility of defendant's witnesses; (3) the weight to be given to the mitigating factors; (4) certain biblical quotations; and (5) the reading of a portion of an opinion written by this Court. Defendant again failed to object to any of the above remarks. We find nothing in the prosecutor's argument so grossly improper as to require the trial judge to act *ex mero motu. See State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983).

[3] With respect to the remarks impugning the character of the defendant and the credibility of both the defendant and his witnesses, the record discloses that each comment was based upon the evidence or on inferences properly drawn therefrom. *See State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203.

[4] Concerning the weight to be given to the mitigating factors, the prosecutor told the jury that "even though you find (the mitigating factors) to exist, you may not accord them any weight in mitigation." The prosecutor then went on to discuss each of the fourteen mitigating factors which would be submitted. For example, with respect to the age of the defendant (thirty-seven) as being a factor in mitigation, the prosecutor noted that there was a coincidence between his age and the fact that defendant inflicted thirty-seven stab wounds; that obviously this factor had been proved and must be considered; but that it should be given no weight. When taken in the context of the prosecutor's careful discussion of each of the mitigating factors, together with the instructions by the trial judge, the comment was within allowable limits of argument. *See State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983).

[5]   The biblical quotations which form the basis of defendant's next exception are not improper in context, when defendant's propensity to quote the Bible in his defense is considered. The prosecutor may have injected his personal opinion as to the value of the Bible as being "maybe . . . the very best law book we have got," but we do not consider this statement grossly improper. *See State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304.

[6]   Defendant strenuously objects to the prosecutor's quoting a portion of *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721 (1974), a case that was overruled by *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944 (1976). Defendant argues that by so quoting, the prosecutor violated N.C. Gen. Stat. § 84-14 which permits counsel to include in argument quotations from opinions or statutes that are relevant and refer to authoritative rules of law. *See State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). Counsel may not read an unconstitutional statute and therefore, argues defendant, by analogy counsel may not quote from a case which has been overruled.

We note initially that this Court on occasion cites as authority cases which have been reversed or overruled where the issue in question, particularly an evidentiary issue, is unaffected by the rationale giving rise to the ultimate disposition of the case. Defendant here argues, however, that the portion of the *Jarrette* opinion quoted by the prosecutor "was part of the rationale holding that a mandatory death sentence could constitutionally be imposed for a conviction of first degree murder and rape" which conclusion was later overruled. The prosecutor's remark, including the quoted portion of *Jarrette*, is as follows:

And ladies and gentlemen of the jury, the Supreme Court of North Carolina, and they have seen hundreds and hundreds of thousands of these cases come through their court system, and their opinion should be given weight. And what do they say? "The steady rising tide of crimes of the most serious nature throughout the nation has occurred in an era of unprecedented permissiveness in our society, in an emphasis on sympathy for the accused rather than for his victim and those endangered by him." And they said this, ladies and

gentlemen of the jury, in a first degree murder case. They said this, this unprecedented permissiveness in our society of sympathy for the accused. "This is ample basis for reasonable man, not just people running out here mad, under the passions of the moment, for reasonable people, to conclude that some punishment of exceptionally vicious crimes, other than imprisonment, coupled with carefully organized programs for rehabilitation, to assure that the prisoner, that he had the sympathy of society, is necessary to bring about the turning of the tide.

We do not agree with defendant's characterization of the quoted portion of *Jarrette* that it formed the rationale of the decision in that case to the extent that the prosecutor was prohibited from referring to it in his argument. The issue in *Jarrette* was whether the capital sentencing scheme as it then existed was constitutional. The Supreme Court of the United States later invalidated that scheme. That Court has since clearly authorized the imposition of the death penalty under carefully limited circumstances. Much of the discussion in *Jarrette,* including the above-quoted portion of the opinion, dealt in general terms with the various arguments which this Court felt justified a death penalty. The above-quoted portion was written in the context of the deterrent effect of a sentence of death and we read the prosecutor's comments here to be likewise an argument relating to the need for the death penalty for its value as a deterrent.

In this regard, we note with interest that the defense attorney responded to the prosecutor's remarks as follows:

I have heard the argument so many times, I have heard so many people say that the death penalty is a deterrent, it has a deterrent effect. And the District Attorney, of course, never argued that to you directly, but he asked you to send a message. He asked you to send a message to put a stop to this, put a stop to this permissive society that we live in, I believe is what he said. And what he is really talking about, of course, is the deterrent effect argument of the death penalty.

Defense counsel then argued strenuously and at length that "the logic of the death penalty as a deterrent is imperfect. . . . We cannot, we cannot kill people who kill people to show that kill-

ing is wrong. It just doesn't work. It never has." Defense counsel stated that the death penalty was not deterrence, but prevention, and erroneously informed the jury that defendant would spend the rest of his life in prison[1] thereby providing the necessary prevention. In light of our assessment, as well as defense counsel's assessment of the prosecutor's motive for quoting from *Jarrette*, we do not agree that this portion of the argument was so grossly improper or prejudicial as to require action on the part of the trial judge or to require a new sentencing hearing.

## IV.

[7] Defendant next argues that the trial court erred in instructing the jury that it could but was not compelled to answer "yes" or "no" to each of the mitigating factors that were submitted but was required only to indicate, as the third issue, whether it found one or more mitigating factors to exist. Defendant objected to the

---

1. N.C. Gen. Stat. § 15A-1370.1 states that Article 85 of the North Carolina General Statutes "is applicable to all sentenced prisoners, including Class A and Class B felons, and Class C felons who receive a sentence of life imprisonment. . . ." N.C. Gen. Stat. § 15A-1371 states in pertinent part that:

"(a1) A prisoner serving a term of life imprisonment with no minimum term is eligible for parole after serving 20 years. This subsection applies to offenses committed on and after July 1, 1981."

We disapprove of defense counsel's attempt to mislead the jury as to the effect of a life sentence and caution defense attorneys to avoid such remarks at *any* stage of the trial proceedings. We furthermore note with some concern that defense counsel provided the jury with the following assessment of its responsibility in determining a sentence:

"The D.A. mentioned at the outset of this trial that, I believe the question he put to you was could you folk be part of the legal machinery that put this man to death. Ladies and gentlemen of the jury, that needs a little clarification. You are not part of the legal machinery, you are the legal machinery that puts the man to death. You are the ones, and you alone, who sign the paper that says death. That merely, ladies and gentlemen of the jury, puts some things into action. They take him down to Raleigh, put him in Central Prison, and set him on death row, and on a day certain and in a year certain and an hour certain, they lead him into the gas chamber, carrying out your orders. They strap him in the gas chamber, ladies and gentlemen of the jury, because you told them to. And then the man drops the pellet in the little pool of acid. He carries out your orders. And then they crank open the louvers and gas fills the gas chamber, and he inhales gas. Poisonous gas fills his lungs, bubbles, and blood oozes from his mouth. . . ."

We consider this portion of defense counsel's argument irrelevant, and highly improper. *See State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979).

instructions as given which appear in the transcript in three separate locations.

This argument has been advanced to our Court on numerous occasions and has been rejected. *See State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, --- U.S. ---, 77 L.Ed. 2d 1398 (1983); *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038 (1982); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, --- U.S. ---, 74 L.Ed. 2d 622 (1982). We do not agree with defendant's assertion that the trial judge, by these instructions, failed to inform the jury that it *must* consider each listed mitigating circumstance before answering "yes" or "no" to the third issue. While the trial judge's first instruction might be somewhat ambiguous, he later stated "In considering that issue (issue 3), *you must consider the sub-issues or sub-sections submitted there, 1 through 14.*" (Emphasis added.) We hold that the trial judge properly instructed the jury on its duty on how it was to consider the mitigating factors.

V.

Defendant contends that the trial judge erred in failing to correctly instruct the jury on the mitigating circumstance that the defendant was under the influence of mental or emotional disturbance. The trial judge instructed that:

A defendant is under such influence if he is in any way affected or influenced by a mental or emotional disturbance at the time he kills. Being under the influence of mental or emotional disturbance is similar to, but not the same as being in the heat of passion upon sudden or adequate provocation. A person may be under the influence of mental or emotional disturbance even if he had no adequate provocation and even if his disturbance was not so strong as to constitute heat of passion or to preclude deliberation. For this mitigating circumstance to exist, it is enough that the defendant's mind or emotions were disturbed from any cause, and that he was under the influence of the disturbance when he killed Wanda Phillips Hartman. You *would* find this mitigating circumstance if you find that on the 7th of August, 1982, the defendant, Arthur Martin Boyd, Jr., was suffering from the effects of excessive use of alcohol and excessive use or abuse of drugs; that he was still suffering from the loss of his

father at an early age, his early age, and of his grandfather at an earlier age; that he was suffering from the loss of the woman that he testified he loved, Wanda Phillips Hartman; that at this time on August 7th, 1982, then that he was so suffering from the mental or emotional disturbance that he was affected and suffered impairment or *loss of his faculties* to the extent that you *should* find or be satisfied from this evidence that he was under the influence of some mental or emotional disturbance. . . .

The first one, as I mentioned, was that the murder was committed while Arthur Martin Boyd, Jr. was under the influence of mental or emotional disturbance. The burden is upon the defendant to satisfy you from the evidence and by its greater weight that he was so under the influence. If he has so satisfied you, you *could* answer that issue yes in his favor; if not so satisfied, you *would* answer the issue no. (Emphasis supplied.)

The defendant argues that "[n]owhere in the entire charge on this mitigating circumstance was the jury told that if it found that the defendant was under the influence of a mental or emotional disturbance, it must, or had a duty to find this mitigating circumstance and consider it in the defendant's favor in its sentence determination." Defendant also objects to the instruction as given inasmuch as "it added to the defendant's burden an additional element to be proven" in that "[i]t required the defendant to prove not only that he was under the influence of a mental or emotional disturbance at the time, but that this disturbance was so great that it *impaired or caused a loss of his faculties*." (Emphasis in the original.)

Defendant objected to this instruction during jury deliberations, but not on the grounds argued on appeal. Rather, the objection was stated as follows:

Your Honor, we would like to OBJECT to the Court instructing the jury on the mitigating factor of the defendant was laboring under a mental or emotional disturbance at the time of the crime wherein the Court stated that the defendant should be, would have to be suffering from the loss of a grandfather or father or abuse of drugs, or one of these, before this mitigating circumstance could be found.

Thus, with respect to the arguments presented on appeal, we will apply the plain error rule as enunciated in *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983). *See State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983).

[8]  Defendant's first attack on this instruction is launched at the trial court's use of the word "could" ("you *could* answer that issue yes in his favor") in its final mandate. As the trial judge, apart from this one *lapsus linguae*, instructed with the mandatory "would" or "should," we do not consider this grammatical *lapsus* so serious as to amount to plain error.

Defendant's objection to the trial court's use of the word "faculties" is equally without merit. The trial judge had, earlier in the instruction, clearly defined mental or emotional disturbance, concluding that "it is enough that defendant's mind or emotions were disturbed from any cause, and that he was under the influence of the disturbance when he killed Wanda Phillips Hartman."

[9]  A mental or emotional disturbance must obviously affect some functioning of the afflicted mind, i.e. cause an impairment or loss of an individual's "faculties." Contrary to defendant's characterization of this word as connoting "some sort of insanity, incompetency or senility," we find the definition of "faculties" quite innocuous:

> "4a: ability to act or do whether inborn or cultivated . . . b: an inherent capability, power, or function . . . c: one of the powers or agencies into which psychologists formerly divided the mind (as will, reason, instinct), and through the interaction of which they endeavored to explain all mental phenomena, d: *obs*: personal characteristics . . ." Webster's Third New International Dictionary of the English Language (1968).

In the context of the overall instructions, we find nothing sinister or additionally burdensome associated with the word "faculties." This assignment of error is overruled.

## VI.

[10]  Defendant next contends that he was deprived of a fair sentencing determination because the trial judge allegedly ex-

pressed his opinion on the credibility of defendant's witnesses and the evidence while instructing the jury on the mitigating factors. Defendant points to the following statements:

1) In instructing on the non-statutory mitigating factor that defendant had lived with the deceased and desired a reconciliation, the trial judge, after summarizing defendant's evidence, stated:

> You will recall the testimony presented by Mr. and Mrs. Phillips as to the events occurring in that connection with regard to whether or not there was a genuine desire for reconciliation at that time.

Defendant argues that this statement expressed the opinion that "the State had introduced evidence, through Mr. and Mrs. Phillips, that the defendant did *not* have a genuine desire for reconciliation"; and that the trial judge "disbelieved all of the defendant's evidence that there was a 'genuine' desire to reconcile with Wanda." Thus, argues defendant, by this one statement "all the defendant's efforts to convince the jury of his genuine feelings of love, frustration, deep sense of loss and inability to cope with the reality of losing Wanda were negated." Our reading of this statement discloses no such expression of opinion. The objection borders on the frivolous.

The second objection argued under this issue involved the trial judge's instruction on defendant's mitigating factors that he had expressed a devotion to God and had been baptized. The trial judge stated:

> You will recall the testimony of the defendant and of one of the preachers that on the 15th day of January, 1983, the defendant was allowed to leave the jail in Surry County and go out to a place called Holder's Bottom, as I understood the testimony, you will recall that for yourself, where a baptism service was then held and he was baptized. The defendant saying and contending that you should be satisfied that this is a mitigating circumstance, the State saying and contending that you should be very skeptical of this and scrutinize this testimony very carefully, not that you would doubt the word of the minister but you would doubt the sincerity of the de-

fendant because he himself testified that he made a false confession at an earlier time in an effort to get Wanda back.

This appears to be an accurate statement of the evidence and the contentions of the parties. We find no basis for objection.

Nor does our reading of the trial court's instruction on the mitigating factor that defendant sought help from others disclose error, favoritism toward one party or the other, or any form of judicial opinion.

In contending that the trial judge expressed his opinion on the credibility of defendant's evidence during the instruction on defendant's addiction to drugs and alcohol as a mitigating factor, the defendant points to the following:

> You will recall the further testimony that he was taking anti-abuse for a period of two and a half years and took it according to the probation officer up until Thursday before this murder took place. Now whether he was taking anti-abuse and at the same time abusing alcohol and drugs to the extent you have heard is a matter for you to say and determine.

Once again we find nothing objectionable in this statement. Defendant's own evidence was to the effect that he was addicted to drugs and alcohol and was also involved in an anti-abuse program.

Finally defendant advances a somewhat circuitous argument that because the trial judge excluded Dr. Humphrey's testimony concerning stressful life events and criminal homicide, his instruction on the nonstatutory mitigating factors concerning defendant's loss of his father and grandfather was erroneous. The trial judge stated:

> The defendant saying and contending that the loss of his grandfather when he was five years old and the loss of his father when he was either six or eight months old, or three years old, creates certain conditions of stress in the mind of the defendant and that you should consider these as mitigating circumstances.

Essentially defendant contends that when Dr. Humphrey's testimony was excluded, he was forced to list these losses as separate mitigating factors, at which point it was error for the

trial judge to attempt "to tie the defendant's contentions to the effect the losses had on defendant's mental state."

Defendant overlooks the fact that defense counsel, during final argument, quite successfully "tied in" these "stressful life events" to defendant's mental state. Counsel argued:

Ladies and gentlemen of the jury, I say and contend to you that that has some mitigating value in this case. This man desperately wanted this woman back. I say and contend to you that he truly loved her. I say and contend to you that he loved her more than anything in the world, more than anything that he had ever loved before. A man who has lost his father at an early age, lost his grandfather, lived the way he has with drugs and alcohol, and finally found something that had a little meaning in his life, and he let it get away from him. And he is desperately seeking to get it back.

Now, ladies and gentlemen of the jury, I don't know that any of you all have ever gone through that. I know I haven't. I don't know if any of you all have or not. I didn't ask you those questions when we selected this jury. But I know one thing, the more we read and the more we hear about losing people, losing mamas and losing daddies, I don't care what it is, ladies and gentlemen of the jury, whether you lose your mama or your daddy, it's going to have an effect on people. Yes, ladies and gentlemen of the jury, it will have an effect on this little girl over here. It will. It is going to have an effect on her, ladies and gentlemen of the jury.

Why does the District Attorney argue that to you, that he won't forget about that little girl as long as he lives? I probably won't either. But yet he wants to say, so what. He lost his daddy. So what? Are we supposed to come into court and say she will suffer but he didn't? It means something to her but it won't to him, it hasn't to him? That, ladies and gentlemen of the jury, is one of the mitigating circumstances that we are submitting to you, that he lost his father at an early age in life. You heard him testify and you heard his mama testify. His father left when he was a young child. He never had any father. Never had any father. He was reared, ladies and gentlemen of the jury, by the lady that you folks

saw testify yesterday. I put her up there so you could see who she was and see the lady that reared this defendant.

The fact that he lost his grandfather at an early age in life. You heard what his mother said about that. It caused some type of problem with this young man, five years old when he lost his grandfather. Ladies and gentlemen of the jury, you will have to decide if that mitigates or not. But it's hard for me to see how one side can say it will be tough for this person but it ain't tough for him. So what? So what?

The trial judge's instruction on these factors was proper.

Our reading of the trial transcript discloses that the trial judge's instructions to the jury in this case were thorough; amazingly accurate considering the volume of testimony; detailed; balanced; and fair. In every instance he carefully stated the contentions of both parties. This assignment of error is overruled.

VII.

[11]   Defendant also argues that the trial court erred in failing to instruct the jury that the State had the burden of proving beyond a reasonable doubt that the aggravating circumstances substantially outweighed the mitigating circumstances sufficiently to call for the death penalty. Defendant further argues alternatively that the trial court erred in instructing the jury that it *must* return a verdict of death if it found that the aggravating factors outweighed the mitigating factors, thereby lowering the State's burden of proof. As was the case in *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, we again find the challenged jury instructions free from constitutional and prejudicial error.

Defendant's remaining assignments of error are prefaced as follows: "The following issues are all issues this Court has previously and recently decided against the defendant. He merely raises them here to give this Court an opportunity to re-examine its previous holdings, and, if this Court declines to do so, for purposes of preserving the issues for later review by a Federal court. *See Engle v. Issac*, 456 U.S. 107 (1982)." While we decline to alter our position on these issues, each will be addressed *seriatim*.

## VIII.

[12]   Defendant contends that he was denied a fair trial because several jurors were improperly excluded from the jury panel due to their beliefs concerning the death penalty. Specifically, defendant claims: (a) that death qualifying a jury prior to the guilt phase results in its being guilt and death prone; and (b) that two jurors were excused in violation of the standard set out in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776 (1968).

With respect to defendant's contention that a guilt and death prone jury results from death qualification, this Court has consistently held the current jury selection process in this State in first degree murder cases constitutional. *See State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197 and *cases cited therein*. We again decline to reconsider this issue.

[13]   Defendant further contends that two jurors, Arrington and Garland Smith, were excluded from the jury panel in violation of the rule in *Witherspoon*. Upon examination of the jury proceedings it appears that juror Arrington did indeed state unequivocally that he could not impose a sentence of death.

> COURT: And regardless of the evidence, however strong it might be, you say you could not and would not vote for the death penalty?
>
> MR. ARRINGTON: No, sir.

Juror Smith, while initially appearing indecisive, did  finally state his opposing opinion.

> COURT: At this time, can you say that your mind is closed to the question of the death penalty?
>
> MR. SMITH: Yes, sir.

This Court finds no error in the exclusion of jurors based on their express opposition to and refusal to apply the death penalty. Defendant's assignment of error is therefore overruled.

## IX.

[14]   Defendant's next contention is that the trial court erred by not informing the jury during the penalty phase that if it was deadlocked a life sentence would be imposed. The jury here delib-

erated for only one hour and forty-seven minutes. This Court stated in *State v. Williams*, 308 N.C. 47, 73, 301 S.E. 2d 335, 351-52, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 177, *reh. denied*, 104 S.Ct. 518 (1983), that "such an instruction is improper because it would be of no assistance to the jury and would invite the jury to escape its responsibility to recommend the sentence to be imposed by the expedient of failing to reach a unanimous verdict." We therefore hold that the trial court did not err in failing to give this instruction and, thus, overrule defendant's assignment of error.

## X.

**[15]** Defendant argues that the aggravating factor of "especially heinous, atrocious or cruel," N.C. Gen. Stat. § 15A-2000(e)(9), is unconstitutionally vague on its face as construed and applied in North Carolina and under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Defendant recognizes that this aggravating circumstance has been consistently upheld when attacked on constitutional grounds of vagueness, yet he urges us to reconsider our position on this issue. We recently did so in *Maynard*, 311 N.C. 1, 316 S.E. 2d 197, and found our interpretation to be entirely consistent with the mandate of *Furman v. Georgia*, 408 U.S. 238, and *Godfrey v. Georgia*, 446 U.S. 420, 64 L.Ed. 2d 398 (1980). *See State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304. We decline to alter our position on this issue and overrule the assignment of error.

## XI.

**[16]** Defendant asserts that he was denied due process by the trial court's failure to instruct the jury that the State had the burden of proving the nonexistence of each mitigating circumstance beyond a reasonable doubt. Defendant further asserts that the trial court erred in placing the burden on him to prove each mitigating circumstance by a preponderance of the evidence. We have consistently rejected this argument and do so again here. *See State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197 (1984); *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144. This assignment of error is overruled.

## XII.

[17]  Defendant argues that the North Carolina capital murder scheme permits subjective discretion and discrimination in imposing the death penalty and is, therefore, unconstitutional under *Furman v. Georgia*, 408 U.S. 238, 33 L.Ed. 2d 346. This Court has repeatedly ruled that N.C. Gen. Stat. § 15A-2000 is constitutional and here do so again. *See State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197. We overrule this assignment of error.

## XIII.

[18]  Defendant contends that the North Carolina death penalty statute, N.C. Gen. Stat. § 15A-2000, and consequently the verdict of death in this case is unconstitutional. The constitutionality of N.C. Gen. Stat. § 15A-2000 has been upheld repeatedly. *See State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197. Defendant's assignment of error is therefore overruled.

### PROPORTIONALITY

[19]  After a thorough review of the transcript, record on appeal and the briefs of the parties, we find that the record fully supports the jury's written findings in aggravation. We further find that defendant's death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor and that the transcript and record are devoid of any indication that such impermissible influences were a factor in sentencing.

Finally we have determined that the death sentence imposed is neither excessive nor disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. *See State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335. We find this case comparable to *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, 454 U.S. 933, *reh. denied*, 454 U.S. 1117 (1981).

We upheld defendant's sentence of death in *Martin* for the shooting death of his wife. As in the present case, the murder was preceded by threats against the victim; the defendant did not murder the victim "in a quick and efficient manner"; *Id.* at 253, 278 S.E. 2d at 219; the victim was murdered in the presence of the victim's child; and defendant presented evidence of social and emotional problems.

The cases cited by defendant involving killings of lovers or spouses in which defendants received life sentences are not comparable. In two cases it was not clear that the defendant personally killed the victim, *see State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983); *State v. Woods*, 307 N.C. 213, 297 S.E. 2d 574 (1982); *State v. Parton*, 303 N.C. 55, 277 S.E. 2d 410 (1981). In *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983), and *State v. Colvin*, 297 N.C. 691, 256 S.E. 2d 689 (1979), there was some evidence to suggest that the killing was not deliberate; and in *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980), defendant, who had no significant history of criminal convictions, testified that the killing was accidental. In two cases no aggravating factors were submitted, *see State v. Calloway*, 305 N.C. 747, 291 S.E. 2d 622 (1982); *State v. Misenheimer*, 304 N.C. 108, 282 S.E. 2d 791 (1981), and therefore, they are not included in the pool used for proportionality review. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335 (1983). In *State v. Anderson*, 303 N.C. 185, 278 S.E. 2d 238 (1981); *State v. Clark*, 300 N.C. 116, 265 S.E. 2d 204 (1980) and *State v. Franks*, 300 N.C. 1, 265 S.E. 2d 177 (1980), there was evidence that the defendants were suffering from legitimate mental or emotional disorder. In the present case, by contrast, there was overwhelming evidence of defendant's guilt, scanty evidence of emotional or mental disorder, which, together with defendant's significant history of criminal convictions and the heinous nature of the crime, including suffering of the victim, provide the basis for a penalty of death.

No error.

Justice EXUM dissenting as to sentence.

The evidence shows defendant, in a public place and in full view of several witnesses, including the victim's mother, stabbed to death the person whom he professed to love the most. The central question at the sentencing hearing was: "Why?" The state argued the crime was motivated by defendant's mean selfishness. Defendant, argued the state, killed the victim because he did not want anyone else to have her if he could not. This is a motive theory that is easy to sell in this kind of case. It may be the truth. Defendant's motive theory was different, less apparent to the average observer, and probably more difficult to sell. It was a theory which does not excuse the crime but which might have mitigated it in the eyes of the jury. Defendant's motive theory

was, in a nutshell, this: Defendant had suffered a number of severe personal losses during his life. He lost his father, his grandfather, his friends, and his liberty. The thought of losing Wanda was so unbearable that defendant considered killing himself. The act of killing Wanda, the one closest to him, was, in effect, an act of self-destruction. Perhaps this is not the truth.

The question before us is not which motive theory, the state's or the defendant's, is more worthy of belief. That question is for the jury. The question is whether defendant should be permitted to offer evidence in support of his theory. The majority says not and affirms a death sentence imposed after a hearing at which defendant was precluded from proffering his theory in mitigation because Professor Jack Humphrey's testimony upon which the theory wholly rested was excluded from the jury's consideration. I cannot join in this decision. Neither reason nor precedent provide any support for it.

The majority concludes Professor Humphrey's testimony is inadmissible because it finds his opinions to be "of questionable scientific import or value in mitigation" and to suggest merely "that defendant's act in murdering Wanda Hartman was predictable."

Many expert opinions in controversial areas are not only "questionable"; they are often vigorously questioned by opposing experts in courts of law. That an expert's opinions may be "questionable" has never been a ground for excluding them from evidence. It goes to the weight not the admissibility of expert testimony.

Generally experts are permitted to give their opinions if through study or experience they are better qualified than the jury to have an opinion on the particular subject under inquiry. N.C. Gen. Stat. § 8-58.13 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

An expert's opinion is admissible if it is "based on the special expertise of the expert, that is, . . . the witness because of his ex-

pertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Sparks*, 297 N.C. 314, 325, 255 S.E. 2d 373, 380-81 (1979); *accord, State v. Wilkerson*, 295 N.C. 559, 568-69, 247 S.E. 2d 905, 911 (1978).

The record demonstrates that Professor Humphrey was a duly qualified expert criminologist. He received his doctorate in sociology "with a concentration in criminology" in 1973 from the University of New Hampshire. He is a full professor at the University of North Carolina at Greensboro where he teaches courses in criminology, criminal justice, juvenile delinquency, and deviant behavior. He has published books entitled: *Panorama of Suicide*, based on a federally funded project on suicide in New Hampshire; *Administration of Justice*; and is presently working on a book, *Deviant Behavior*, which is due to be published "in the next year or so." He has worked with Dr. Page Hudson, North Carolina's Chief Medical Examiner, "on various projects . . . having to do with violent and unexplained death. Many of those papers . . . are co-authored with Dr. Hudson." Professor Humphrey has participated in various professional meetings "delivering papers on matters of suicide and homicide and other forms of violence." Since 1968 his professional studies "have concentrated almost solely on violent death."

Clearly criminology is an area of "scientific, technical, [and] specialized knowledge." It is defined by *Webster's Third New International Dictionary* as "the scientific study of crime as a social phenomenon, of criminal investigation, of criminals, and of penal treatment." According to *The Columbia Encyclopedia* (3d ed. 1963), criminology has "[s]ince 1910 . . . become a science with the introduction of intensive research and statistical analysis. . . . Criminology as a study also embraces environmental, hereditary, or psychological causes [of crime]. . . ."

Most recently Professor Humphrey conducted a study and co-authored a report based thereon with Professor Stewart Palmer, "one of the leading figures in homicide research in the United States and author of *Psychology of Murder, the Violent Society*." This study, done in cooperation with the North Carolina Department of Corrections, was directed essentially to two questions. One was, "Do homicide offenders over the course of their lifetime suffer more [stressful life events] than do non-violent felons?" The second was, "Is there a difference between offenders who kill

family members or someone close to them as opposed to people who kill strangers or mere acquaintances?" After conducting studies of some 272 homicide offenders and 192 non-violent offenders incarcerated in the North Carolina Department of Corrections, Professors Humphrey and Palmer concluded that "homicide offenders tend to experience more stressful events than do non-homicide offenders over the course of their lifetime prior to the commission of the crime." More importantly, for purposes of this case, the professors also considered a "major finding" to be that "people who tend to kill those close to them tend to experience more *loss in their lives* than those who kill strangers." (Emphasis supplied.)

The import of Professor Humphrey's testimony was not that defendant's act was predictable. Indeed, he never so testified. His testimony was directed toward explaining defendant's conduct and establishing defendant's motive for the murder. Professor Humphrey was prepared to testify:

> The more loss in someone's life, the more likely they are to become self-destructive. And it seems that killing a family member or killing a close friend is an act of self-destruction. They are, after all, killing something that is part of them, very close to them, very important to their self. They are destroying them. So in the act of killing another person they are in fact destroying part of their self, a self-destructive act.

Professor Humphrey interviewed defendant. He was prepared to testify that during this interview defendant related a life "which seemed to involve an inordinate amount of losing things, losing his father, losing his grandfather. He didn't have very many friends, and those he had he kept losing them. As his life progressed he lost his liberty. He was incarcerated, repeatedly. . . . [T]he one predominate factor seemed to be repeated losses." When asked about the offense in question, defendant said, "The most important thing he had at the moment was this relationship with his girlfriend, and . . . he was on the verge of losing that, at the time the crime was committed." Defendant further volunteered information that before the homicide "he would wake up in the middle of the night with thoughts of killing himself."

Professor Humphrey was prepared to testify that "what struck me is the consistency of Mr. Boyd's life with what we found to be true of homicide offenders in general. It seemed pret-

ty obvious that what was true of the group of people who had killed someone close to them was especially true of Mr. Boyd." This was "[m]ainly . . . the accumulation of loss throughout their lives, and this tendency to be self-destructive."

Professor Humphrey was prepared to testify that people like defendant "who are threatened with loss . . . of someone very close to them, wife, girlfriend, . . . become depressed . . . and depression is in a sense anger turned toward yourself. . . . Those people who destroy someone or something at that point will not destroy a stranger, will not indiscriminately kill. They don't constitute a threat to the public. They constitute a threat to that which they fear losing the most, the person closest to them. And it is that person who is unfortunately in harm's way. And having extended that aggression toward other people they are in fact aggressing toward themselves. They are destroying that which they fear losing the most. . . . A desperately needed part of their life."

Under our rules governing the admissibility of expert testimony, Professor Humphrey's testimony was competent on the question of defendant's motive. He was a duly qualified expert criminologist by training, study and experience, and he was in a better position to have opinions on this question than the jury. The jury, of course, would have been free to reject his opinions. There is, however, no legal reason for excluding them from the jury's consideration.

Decisions of the United States Supreme Court have been replete with references which point consistently to the proposition that a death sentence may not be constitutionally carried out if the sentencing authority is not permitted to consider all aspects of a defendant's character, mentality, emotional makeup, record, and circumstances of the crime which might tend to mitigate the offense in the eyes of the jury. *Eddings v. Oklahoma,* 455 U.S. 104, 116 (1982) ("background and mental and emotional development of a youthful defendant [must] be duly considered in [a capital sentencing proceeding]"); *Lockett v. Ohio,* 438 U.S. 586, 604 (1978) ("[T]he Eighth and Fourteenth Amendments require that the sentencer [in a capital sentencing proceeding] not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less

than death"); *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976) (a process for imposing a death penalty is unconstitutional if it "excludes from consideration in fixing the ultimate penalty of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of human kind").

This Court in interpreting our statute has said: "The circumstances of the offense and the defendant's age, character, education, environment, habits, mentality, propensities and criminal record are generally relevant to mitigation," recognizing, of course, that evidence which is "repetitive or unreliable . . . or lacking in an adequate foundation" may be excluded. *State v. Pinch,* 306 N.C. 1, 19, 292 S.E. 2d 203, 219 (1982). The Court has further said, "Evidentiary flexibility is encouraged in the serious and individualized process of life or death sentencing. *See Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). However, as in any proceeding, evidence offered at sentencing must be pertinent and dependable, and, if it passes this test in the first instance, it should not ordinarily be excluded." *Id.* at 19, n. 9.

Professor Humphrey's testimony meets all these requirements for admissibility. It was not repetitive. It was based on scientifically conducted criminological studies, including an interview with defendant, done in accordance with the dictates and discipline of this science. It was pertinent and no less reliable or dependable than similar expert testimony ordinarily admitted every day in courts of law. The testimony was proffered to mitigate the crime. The testimony was sufficient to permit, but not require, the sentencing jury reasonably to infer that defendant did not murder the victim out of meanness or selfishness but rather out of a sense of unbearable personal loss in which the killing was in defendant's mind an act of self-destruction. It was only in the light of Professor Humphrey's testimony that evidence which the jury heard regarding the defendant's other losses made sense. As defendant aptly puts it in his brief, without Professor Humphrey's testimony, "the entire structure of the defendant's theory of mitigation was shattered into little pieces. Presented only as broken bits, there was virtually no hope that the defendant could convince the sentencing jury that his was a case arising out of the 'frailties of human kind' which called for compassion and mitigation of the ultimate penalty of death."

Although it is not entirely clear from its opinion, the majority apparently also holds that even if it was error not to admit Professor Humphrey's testimony, the error did not prejudice defendant. An error of constitutional dimension, as I think this was, is prejudicial, i.e. reversible, unless an "appellate court finds that it was harmless beyond a reasonable doubt." N.C. Gen. Stat. § 15A-1443(b). Other errors are reversible if "there is a reasonable possibility that, had the error . . . not been committed, a different result would have been reached at the trial. . . ." N.C. Gen. Stat. § 15A-1443(a). Since Professor Humphrey's testimony was the linchpin of defendant's theory of mitigation and given his impressive academic credentials, there is a reasonable possibility that admission of his testimony would have produced a different result at trial. Clearly, I cannot conclude beyond a reasonable doubt that its exclusion was harmless.

Because of the exclusion of Professor Humphrey's testimony, defendant is entitled to a new sentencing hearing.

Justice MARTIN joins in this dissenting opinion.