STATE v. PRIVETTE

[218 N.C. App. 459 (2012)]

STATE OF NORTH CAROLINA v. ANTWON T. PRIVETTE AND DEANGELO DARNE SMITH

No. COA11-139

(Filed 7 February 2012)

## 1. Pretrial Proceedings—criminal prosecution—joinder—proper

The trial court did not err in a felonious possession of stolen goods, extortion, and conspiracy to commit extortion case by allowing the State's joinder motion. The trial court's joinder decision did not deprive defendant of a fair trial.

## 2. Evidence—gang-related—felonious possession of stolen goods—no prejudice

The trial court did not err or commit plain error in a felonious possession of stolen goods case by failing to exclude certain gang-related evidence offered by the State. Assuming that the trial court erred by permitting the introduction of the evidence, there was no reasonable possibility that the jury would have acquitted defendant of possessing stolen property had that error not been committed.

## 3. Criminal Law—closing arguments—comments ill-advised—not fundamentally unfair

The trial court did not commit reversible error in a felonious possession of stolen goods case by failing to intervene *ex mero motu* during the State's closing argument. While the prosecutor would have been better advised to have refrained from making some of the comments to which defendant directed the Court of Appeals' attention, any impropriety in the challenged portions of the prosecutor's closing argument did not render defendant's trial fundamentally unfair.

## 4. Possession of Stolen Property—felonious possession of stolen goods—sufficient evidence

The trial court erred in a felonious possession of stolen goods case by denying defendant's motion to dismiss. There was insufficient evidence of "other incriminating circumstances" indicating that defendant constructively possessed the stolen rings.

**5. Criminal law—jury instructions—extortion—proper interpretation of statute**

The trial court's jury instruction on extortion did not materially misrepresent the law. The relevant statutory language required proof that defendant intentionally utilized unjust or unlawful means in attempting to obtain property or other acquittance, advantage, or immunity that he sought and the instruction was fully consistent with a proper interpretation of N.C.G.S. § 14-118.4.

**6. Crimes, Other—extortion—conspiracy to commit extortion—sufficient evidence**

The trial court did not err in an extortion and conspiracy to commit extortion case by denying defendant's motion to dismiss the charges. The State presented sufficient evidence that defendant wrongfully threatened the victim with death or serious injury in order to gain his release from imprisonment and the dismissal of criminal charges.

**7. Evidence—officer's testimony—history and activities of gangs—irrelevant—erroneous**

The trial court erred in an extortion and conspiracy to commit extortion case by admitting a police officer's testimony concerning the history of the Bloods and the activities of various Bloods subsets. The evidence had no bearing on the issue of defendant's guilt of the crimes with which he had been charged as the evidence did not tend to make the existence of any fact that was of consequence to the determination of the action more probable or less probable than it would have been without the evidence.

**8. Evidence—officer's testimony—hierarchy of gang structure—relevant to extortion-related charges**

The trial court did not err in an extortion and conspiracy to commit extortion case by admitting a police officer's testimony concerning the hierarchy of gang structure in the Bloods. The evidence was relevant to the charges as it shed light on the relationship between defendant and other parties involved.

**9. Evidence—photographs of tattoos—testimony regarding relationship between tattoos and gangs—relevant—not prejudicial**

The trial court did not err in an extortion and conspiracy to commit extortion case by admitting photographs of defendant's

tattoos and related testimony describing the relationship between certain of these particular tattoos and Bloods symbology. The photographic evidence depicting defendant's rank within the Bloods was relevant to the extortion-related charges as it shed light on some of defendant's statements and on the subsequent behavior of other involved parties. Moreover, the prejudicial effect of this photograph and related testimony was not so great as to compel its exclusion pursuant to N.C.G.S. § 8C-1, Rule 403.

**10. Evidence—telephone conversation—defendant and wife—not relevant**

The trial court erred in an extortion and conspiracy to commit extortion case by admitting evidence concerning a telephone conversation between defendant and his wife. The conversation had no tendency to make the existence of defendant's authority, or lack thereof, over his wife more probable or less probable than would have been the case had the challenged evidence not been admitted.

Appeal by defendants from judgments entered 13 May 2010 by Judge Kenneth C. Titus in Wake County Superior Court. Heard in the Court of Appeals 31 August 2011.

*Attorney General Roy Cooper, by Assistant Attorney General Steven Armstrong for the State in response to Defendant Antwon T. Privette.*

*Attorney General Roy Cooper, by Assistant Attorney General Jason T. Campbell, for the State in response to Defendant DeAngelo D. Smith.*

*Michele Goldman, for defendant-appellant Antwon T. Privette.*

*Duncan B. McCormick, for defendant-appellant DeAngelo D. Smith.*

ERVIN, Judge.

Defendants Antwon T. Privette and DeAngelo D. Smith appeal from judgments imposed by the trial court sentencing Defendant Smith to 90 to 117 months imprisonment based upon his convictions for felonious possession of stolen goods and having attained habitual felon status and sentencing Defendant Privette to 133 to 169 months imprisonment based upon his convictions for extortion, conspiracy to commit extortion, felonious possession of stolen goods, and having

attained habitual felon status. After careful consideration of Defendants' challenges to the trial court's judgments in light of the record and the applicable law, we find no error in the trial court's judgments with respect to Defendant Smith, reverse Defendant Privette's conviction for possession of stolen goods, and award Defendant Privette a new trial in his extortion-related cases.

## I. Factual Background

### A. Substantive Facts

#### 1. Robbery of Perry Brothers Jewelers

On 14 May 2009, Gary Lynn and Frank Marsh robbed Perry Brothers Jewelers. At that time, Mr. Marsh and Mr. Lynn, who were armed, took approximately twenty-two rings. After exiting the store, Mr. Lynn and Mr. Marsh entered a Nissan Murano driven by a third person. Subsequently, investigating officers determined that Deidre Archie, one of Privette's girlfriends, had rented the Murano on 11 May 2009.

#### 2. Placing of "Grill" Order at A-Town Jewelz

On 15 May 2009, Smith telephoned A-Town Jewelz and asked Erica Wilkins, the clerk, if the store purchased scrap gold. Later that day, Defendants came to A-Town Jewelz. Smith gave four gold rings to Ms. Wilkins for use in making a custom mouthpiece known as a "grill," signed a receipt evidencing this transaction, and wrote a telephone number belonging to Privette on that document. Later that day, Privette telephoned Ms. Wilkins for the purpose of asking her out. During that conversation, Privette mentioned that he had "more scrap gold." The rings that Smith gave to Ms. Wilkins had been taken in the Perry Brothers robbery. Two of the recovered rings were valued at approximately $3,235.00.

#### 3. Investigation

On 15 May 2009, an officer of the Raleigh Police Department spotted Smith driving the Murano used in the Perry Brothers robbery, followed him into an apartment complex, and unsuccessfully attempted to speak with him. A subsequent search of the Murano resulted in the seizure of the A-Town Jewelz receipt signed by Smith and a vehicle rental receipt signed by Ms. Archie. The fingerprints of Privette, Mr. Lynn, Mr. Marsh, Smith's girlfriend, Doneisha Sanders, and Privette's wife, Shuntraya Cabbagestalk-Privette, were detected on the inside and outside of the vehicle.

#### 4. Privette's Statement

After his arrest, Privette told investigating officers that he and a friend had gone to Perry Brothers during the week of the robbery in order to find a gift for Ms. Cabbagestalk-Privette. Privette stated that he could not have been involved in the Perry Brothers robbery because he was at home and subject to electronic monitoring at the time the robbery occurred.[1] Privette admitted that he had been with Ms. Archie when she rented the Murano and with Smith during his visit to A-Town Jewelz.

#### 5. Smith's Statement

Smith admitted to investigating officers that he was a gang member and that he had borrowed the Murano from Ms. Archie on the date of the Perry Brothers robbery. On that date, Smith had been "driving around" in the Murano with two fellow gang members known as "G" and "Chop," a pair of individuals later identified as Mr. Lynn and Mr. Marsh. According to Smith, "G" and "Chop" dropped him off at the home of another girlfriend, Katrina Smith, and drove off in the Murano.[2] Approximately one hour later, "G" and "Chop" picked Smith up and gave him four or five rings for allowing them to use the Murano. Smith admitted that he thought that the rings might be the proceeds of a "lick," which is another word for a robbery. Smith took the rings to A-Town Jewelz the following day.

#### 6. Recorded Jailhouse Telephone Conversations

While in police custody, Defendants made numerous telephone calls,[3] many of which related to efforts by Privette and Ms. Cabbagestalk-Privette to have Mr. Lynn and Mr. Marsh confess to the Perry Brothers robbery. For example, Ms. Cabbagestalk-Privette informed Privette in a 27 May 2009 conversation that she had told Mr. Lynn that Privette was "locked up for [a robbery] he [ain't] even done" and that, "if [Mr. Lynn] did the [robbery,] [he] need[ed] to man up and own up to [his] charge." Subsequently, Privette told Ms. Cabbagestalk-Privette to "call [Mr. Lynn] and tell him I said if he don't come down here and tell these people that I ain't . . . know nothing

---

1. A subsequent check of Privette's electronic monitoring records verified this contention.

2. According to Ms. Smith's school attendance records, she was in school at the time of this alleged visit

3. Officer Lisa Mendez of the Raleigh Police Department testified at trial for the purpose of interpreting the terminology used in these conversations.

about it, and I ain't have nothing to do with that . . . he fitting to get rolled."[4] In addition, Privette told Ms. Cabbagestalk-Privette to:

> [t]ell . . . [Mr. Marsh], or whatever, robbed the jewelry store with mace and a gun. I don't care what . . . they robbed it with, but the thing is [they] need to clear me. [They] need to clear me you. I am down here, they already know I ain't do nothing, I ain't have nothing to do with nothing, you know what I am saying? . . . If [they] turn themselves in [they] don't get nothing but like 10 to 12 months.

Similarly, Privette told Ms. Cabbagestalk-Privette to tell Mr. Lynn that he had "[three] days to get down here . . . or he rolled." During a 1 June 2009 conversation, Ms. Cabbagestalk-Privette told Privette that Mr. Lynn had asked her whether he was "on a plate;"[5] in response, Privette noted that he had previously told Mr. Lynn that "he [was] food," which meant that he was in violation of gang code and susceptible to attack. On 17 June 2009, Smith told Mr. Lynn to listen to the Defendants and that he had a deadline by which he needed to turn himself in. Mr. Lynn and Mr. Marsh subsequently turned themselves in to authorities, confessed to the Perry Brothers robbery, and pled guilty to robbery-related charges arising from the robbery. Mr. Lynn was not a suspect in the Perry Brothers robbery at that time.

## B. Procedural History

On 8 February 2010 and 9 February 2010, the Wake County grand jury returned bills of indictment charging Smith with felonious possession of stolen goods and having attained habitual felon status. On 18 November 2008, 8 February 2010, and 9 March 2010, the Wake County grand jury returned bills of indictment charging Privette with having attained habitual felon status; felonious possession of stolen goods; extortion; and conspiracy to commit extortion.[6]

The cases against Defendants came on for trial before the trial court and a jury at the 3 May 2010 criminal session of the Wake

---

4. According to Officer Mendez, the word "rolled," in gang terminology, meant "murder[ing] someone."

5. According to Officer Mendez, the fact that someone was "on the plate" meant that he or she had violated gang code

6. Although additional charges were lodged against Defendants, the textual discussion focuses on those charges that are relevant to the issues Defendants have raised on appeal given that a majority of these other charges were dismissed by the trial court or resulted in acquittals

County Superior Court. Prior to trial, the trial court granted the State's motion to join the cases against Defendants for trial.[7] At the conclusion of the evidence, the trial court dismissed a number of the charges that had been lodged against Defendants. On 12 May 2010, the jury returned verdicts convicting Smith of possessing stolen property and convicting Privette of possessing stolen property, extortion, and conspiracy to commit extortion.[8]

After the return of the jury's verdict, both Defendants pled guilty to having attained habitual felon status. As a result, the trial court sentenced Smith to 90 to 117 months imprisonment and sentenced Privette to a consolidated term of 133 to 169 months imprisonment. Defendants noted appeals to this Court from the trial court's judgments.

## II. Legal Analysis

### A. Appeal of Defendant Smith

#### 1. Joinder

[1] In his first challenge to the trial court's judgment, Smith contends that the trial court erred by allowing the State's joinder motion. In seeking to persuade us of the validity of this contention, Smith points to the admission of evidence concerning Privette's threats against Mr. Lynn and to the admission of a letter from Privette to Smith's mother insinuating that Smith "participated in the robbery as the driver," arguing that the admission of this evidence "made it impossible for Smith to receive a fair determination with respect to his guilt or innocence." Defendant's argument lacks merit.

North Carolina "has a 'strong policy favoring consolidated trials of defendants accused of collective criminal behavior.' " *State v. Roope*, 130 N.C. App. 356, 364, 503 S.E.2d 118, 124, *disc. review denied*, 349 N.C. 374, 525 S.E.2d 189 (1998). "A trial court's ruling on . . . questions of joinder or severance . . . is discretionary and will not be disturbed absent a showing of abuse of discretion." *State v. Carson*, 320 N.C. 328, 335, 357 S.E.2d 662, 666-67 (1987). " 'The test is whether the conflict in defendants' respective positions at trial is of

---

7. Both Defendants objected to the joinder of their cases for trial by way of either a formal objection or a severance motion. In addition, Smith unsuccessfully renewed his motion to sever on a number of occasions

8. The jury could not reach a verdict concerning the issue of Smith's guilt of conspiracy to commit robbery with a dangerous weapon, resulting in the declaration of a mistrial with respect to that charge.

such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial.' " *State v. Lowery*, 318 N.C. 54, 59, 347 S.E.2d 729, 734 (1986) (quoting *State v. Nelson*, 298 N.C. 573, 587, 260 S.E.2d 629, 640 (1979), *cert. denied sub nom. Jolly v. North Carolina*, 446 U.S. 929, 100 S. Ct. 1867, 64 L. Ed. 2d 282 (1980)).

After carefully reviewing the record, we are unable to conclude that the trial court's joinder decision deprived Smith of a fair trial. As the record clearly reflects, the only issues that the trial court submitted for the jury's consideration with respect to Smith involved his guilt or innocence of possessing stolen property and conspiracy to commit robbery with a dangerous weapon. As a result of the jury's inability to reach a unanimous verdict with respect to the conspiracy charge, it is clear that the admission of evidence insinuating that Smith drove the Murano at the time of the Perry Brothers robbery did not harm Smith in this case.[9] Similarly, aside from the fact that the threats that Privette made against Mr. Lynn were not relevant to the possession of stolen property charge for which Smith was convicted, we conclude that the evidence against Smith relating to that charge was so strong that there is no reasonable possibility that the jury would have reached a different result had the trial court refrained from joining Defendants' cases for trial. More particularly, the fact that Smith brought rings that had been stolen during the Perry Brothers robbery to A-Town Jewelz and acknowledged that these rings might have been acquired in a "lick" provides almost conclusive evidence of his guilt of felonious possession of stolen property. As a result, we conclude that the trial court did not abuse its discretion by allowing the State's joinder motion.

### 2. Admission of Gang-Related Evidence

**[2]** Secondly, Smith contends that the trial court erred and committed plain error by failing to exclude certain gang-related evidence offered by the State, including testimony concerning the history, organization, practices and symbology of the United Blood Nation gang; testimony concerning Smith's membership in that organization; and photographs of Defendants' tattoos. Once again, we conclude that Smith's argument lacks merit.

Prior to trial, both the State and Privette filed motions seeking a pretrial determination of the admissibility of gang-related evidence.

9. We express no opinion concerning the propriety of joining any future trial conducted for the purpose of determining Smith's guilt of conspiracy with charges lodged against Privette or anyone else.

At the conclusion of the hearing held with respect to these motions, the trial court decided to allow the admission of testimony concerning "general things . . . with respect to ranks" and Smith's admission of gang membership and rank. However, the trial court excluded testimony concerning attaining gang rank through violence or the accumulation of a criminal record.

At trial, the State presented evidence establishing that both Defendants were affiliated with the Bloods. In addition, the State, over objection, elicited evidence that Smith had admitted to being a ranking member of the Bloods. Furthermore, Officer Mendez was allowed to testify concerning the history and organization of the Bloods, including the Bloods subsets that operated in Raleigh. Over objection, Officer Mendez was permitted to describe the Bloods' "books of knowledge," which contained the specific history of a given gang subset, the codes used for internal gang communications, the gang hierarchy, the prayers that gang members are required to memorize, the identity of the gang's leaders, and gang symbology. Finally, the State was allowed, over objection, to introduce photographs of Defendants' tattoos and to offer testimony describing Defendants' tattoos and their relationship to gang symbology.

In order to successfully challenge the admission of this evidence on appeal, Smith must demonstrate both that the trial court erred in admitting the challenged evidence and that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached." N.C. Gen. Stat. § 15A–1443(a). "Where there exists overwhelming evidence of defendant's guilt[,] defendant cannot make such a showing; this Court has so held in cases where the trial court improperly admitted evidence relating to defendant's membership in a gang." *State v. Gayton*, 185 N.C. App. 122, 125, 648 S.E.2d 275, 278 (2007) (internal quotation marks omitted) (holding that admission of evidence of gang activity was harmless error).

Assuming that the trial court erred by permitting the introduction of gang-related evidence against Smith, we do not believe that there is a reasonable possibility that the jury would have acquitted Smith of possessing stolen property had that error not been committed. *State v. Hope*, 189 N.C. App. 309, 316-17, 657 S.E.2d 909, 913-14 (holding that the erroneous admission of gang-related evidence did not prejudice the defendant given the overwhelming evidence of his guilt), *disc. review denied*, 362 N.C. 367, 664 S.E.2d 315 (2008); *State v. Hightower*, 168 N.C. App. 661, 667, 609 S.E.2d 235, 239 (declining to

determine whether evidence of defendant's gang membership was admitted in error given the overwhelming evidence of the defendant's guilt), *disc. review denied*, 359 N.C. 639, 614 S.E.2d 533 (2005). As we have previously discussed, the record demonstrates that Smith brought rings stolen in the Perry Brothers robbery to A-Town Jewelz and that he admitted that these rings might have been obtained in a "lick." Simply put, "[i]gnoring all evidence related to gangs and gang activity, the unchallenged evidence presented by the State at trial showed that [Smith committed the crime charged.]" *Gayton*, 185 N.C. App. at 126, 648 S.E.2d at 279. As a result, Smith is not entitled to appellate relief based on the admission of gang-related evidence.

### 3. State's Closing Argument

**[3]** Finally, Smith contends that the trial court committed reversible error by failing to intervene *ex mero motu* during the State's closing argument. Once again, we conclude that Smith's argument lacks merit.

During closing argument, the State argued, in pertinent part, that:

> But why should you care? . . . [Y]ou live in different areas within Wake County. Maybe one or two of you live near this area, but you may live in Morrisville or Wake Forest or Cary or wherever. And maybe you don't know a lot of people like Antwon Privette or DeAngelo Smith, and it's not your neighborhood. But because you're jurors in this county, it's your community. And, you know, you're responsible for what goes on in this community and what we allow to go on in this community. You may not think they're your neighbors, but Cynthia Perry is your neighbor. And Gary Lynn could be your neighbor, and he could have been somebody if he didn't fall under the influence and control of people that are charged with these crimes in this courtroom.
>
> Now, police have spent thousands of hours and resources investigating these crimes. These are your police. These are your courts. And if you don't do what the law requires here and follow the law as the Judge is about to give it to you and find the truth in the matter—and I would tell you that the truth only lies in this case with the evidence the state has put in front of you because I've detailed dozens of—or multiple lies coming from the other table. If you don't send a clear message that they're guilty and this is not okay—whether it's in southeast Raleigh, whether it's in your backyard, in your community—

there are going to be more guns in the faces of people like Cynthia Perry who's your neighbor. And there are going to be more young men like Gary Lynn who could have been somebody.

[Def. Privette]: Your Honor, I'd object to this.

The Court: Sustained as to . . . what Gary Lynn might have been.

[The State]: But people are afraid . . . and they'll do whatever they say even if it means committing felonies and coming in and trying to hide it from them. So unless you do what we're asking you to do—and I'm imploring you and really begging you to find them guilty of these charges—then, you know, that's the message that's being sent around this community.

If you do the right thing and you honestly consult your conscience and consult the facts and consult the law as the Judge gives it to you, I believe all 12 of you will be able to go back [] there and agree that both of these defendants are guilty of the crimes charged. And we're glad you did, and the community will thank you as I thank you.

In his brief, Smith contends that the prosecutor's contentions that (1) the jury was responsible for what went on in the community, (2) the community would thank the jury for convicting Defendants and (3), in the event that the jury failed to convict Defendants, there would "be more guns in the faces of people like [the jewelry store clerk,] who's your neighbor," exceeded the limits on proper prosecutorial jury arguments. As a result of the fact that Smith failed to object to the portion of the State's closing argument that he seeks to challenge on appeal, our task is to determine "whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu.*" *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted). However, "only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 117 S. Ct. 228, 136 L. Ed. 2d 160 (1996). As a result, "[s]uch remarks constitute reversible error only when they render the proceeding fundamentally unfair." *State v. Phillips*, 365 N.C. 103, 144, 711 S.E.2d 122, 150 (2011) (citation omitted).

A careful review of the record demonstrates that, while the prosecutor would have been better advised to have refrained from making some of the comments to which Smith has directed our attention, *State v. Golphin*, 352 N.C. 364, 471, 533 S.E.2d 168, 237 (2000) (noting that "[t]he State cannot encourage the jury to lend an ear to the community"), *cert. denied*, 532 U.S. 931, 121 S. Ct. 1379, 149 L. Ed. 2d 305 (2001); *State v. Abraham*, 338 N.C. 315, 339, 451 S.E.2d 131, 143 (1994) (stating that, "[w]hile the prosecution may not argue the effect of defendant's conviction on others, i.e., general deterrence, the prosecution may argue specific deterrence, that is, the effect of conviction on defendant himself"), any impropriety in the challenged portions of the prosecutor's closing argument did not render Smith's trial fundamentally unfair. *State v. Boyd*, 311 N.C. 408, 418, 319 S.E.2d 189, 197 (1984) (holding that the prosecutor's comments during closing argument did not merit *ex mero motu* intervention and, alternatively, that any alleged impropriety was not prejudicial given that the record provided ample support for the jury's verdict), *cert. denied*, 471 U.S. 1030, 105 S. Ct. 2052, 85 L. Ed. 2d 324 (1985); *State v. Rush*, 196 N.C. App. 307, 311, 674 S.E.2d 764, 768 (holding that, even if "the prosecutor's argument was grossly improper, given the amount of evidence against defendant, it could not have been prejudicial"), *disc. review denied*, 363 N.C. 587, 683 S.E.2d 706 (2009). In light of the fact that Smith brought rings stolen from Perry Brothers to A-Town Jewelz and admitted that these rings might have been obtained as the result of a "lick," the record contains "ample support for [Smith's] conviction [for possession of stolen property] despite [any] improper remarks [that may have been made during the State's closing argument]." *Boyd*, 311 N.C. at 418, 319 S.E. 2d at 197. As a result, we conclude that Smith's final challenge to the trial court's judgment lacks merit.

## B. Appeal of Defendant Privette

### 1. Sufficiency of the Evidence of Possession of Stolen Property

**[4]** In his first challenge to the trial court's judgment, Privette contends that the trial court erred by denying his motion to dismiss the felonious possession of stolen goods charge that had been lodged against him on the grounds that the record evidence did not support a finding that he actually or constructively possessed the stolen rings. Privette's argument has merit.

In order to justify the denial of a motion to dismiss for insufficient evidence, the State must present substantial evidence of "(1) each essential element of the [charged offense] and (2) defendant's

being the perpetrator of such offense." *State v. Johnson*, ___ N.C. App. ___, ___, 693 S.E.2d 145, 148 (2010) (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). On appeal, we view "the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Morgan*, 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004), *cert. denied*, 546 U.S. 830, 126 S. Ct. 47, 163 L. Ed. 2d 79 (2005). We review a trial court's decision to deny a motion to dismiss for insufficient evidence *de novo*. *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007).

The essential elements of felonious possession of stolen property are: "(1) . . . possession of personal property[;] (2) valued at greater than [$1,000.00;] (3) which has been stolen[;] (4) with the possessor knowing or having reasonable grounds to believe the property was stolen[;] and (5) with the possessor acting with dishonesty.' " *State v. Parker*, 146 N.C. App. 715, 717, 555 S.E.2d 609, 610 (2001) (quoting *State v. Brantley*, 129 N.C. App. 725, 729, 501 S.E.2d 676, 679 (1998)). "[P]ossession . . . may be either actual or constructive. Constructive possession exists when the defendant, while not having actual possession [of the goods] . . . has the intent and capability to maintain control and dominion over the[m]." *State v. Phillips*, 172 N.C. App. 143, 146, 615 S.E.2d 880, 882-83 (2005) (internal quotation marks and quotations omitted). "Where . . . the defendant's possession . . . is nonexclusive, constructive possession may not be inferred in the absence of other incriminating circumstances." *State v. Alston*, 91 N.C. App. 707, 710, 373 S.E.2d 306, 309 (1988) (citation omitted).

As the State acknowledges, the record contains no evidence tending to show that Privette actually possessed the stolen rings. On the other hand, the State does contend that the evidence presented at trial shows the existence of the "other incriminating circumstances" necessary to establish constructive possession, including (1) the fact that Privette, Smith, Mr. Marsh, and Mr. Lynn all belonged to the Bloods; (2) the fact that Privette had a high rank within that organization; (3) the fact that Smith allowed Mr. Marsh and Mr. Lynn to borrow the Murano; (4) the fact that Mr. Lynn and Mr. Marsh gave Smith rings which Smith assumed to be the proceeds of a robbery; (5) the fact that Privette accompanied Smith to A-Town Jewelz; (6) the fact that Privette told Ms. Wilkins that he had "more scrap gold;" and (7) the fact that Privette became upset with Ms. Cabbagestalk-Privette when she indicated that she planned to tell an unidentified

woman to "give me the rings." We do not find the State's argument persuasive.

As the Supreme Court has clearly stated, a defendant's presence at premises at which contraband is located does not establish that the defendant constructively possessed the items in question unless he or she was in such "close juxtaposition to the [contraband] as to raise a reasonable inference [of control]." *State v. Minor*, 290 N.C. 68, 74, 224 S.E.2d 180, 185 (1976). In *Minor*, the Supreme Court held that evidence tending to show that (1) the defendant had visited an abandoned house leased or controlled by a co-defendant; (2) a marijuana field was located in a wooded area near the house; (3) the field could be accessed by three routes; and (4) the defendant was arrested while sitting in the front passenger seat of the co-defendant's vehicle did not support a finding of constructive possession. *Id.* at 74-75, 224 S.E.2d at 185. As a result of the fact that "the most the State ha[d] shown [was] that the defendant [was] in an area where he could have committed the crimes charged," the Supreme Court concluded that a determination that the evidence tended to show constructive possession would involve "sail[ing] in[to] a sea of conjecture and surmise." *Id.* at 75, 224 S.E.2d at 185.

After carefully reviewing the record, we hold that the necessary "other incriminating circumstances" cannot be inferred from the fact that (1) Privette was a high-ranking member of a gang to which the other individuals involved in the underlying robbery and subsequent transfer of the stolen goods belonged; (2) Privette accompanied a person in actual possession of stolen property to an enterprise at which an apparently legitimate transaction occurred; and (3) Privette and Ms. Cabbagestalk-Privette made ambiguous references to "more scrap gold" and "rings" unaccompanied by any indication that tended to indicate that these items were stolen.[10] At most, the State has established that Privette "had been in an area where he could have committed the crimes charged." *Minor*, 290 N.C. at 75, 224 S.E.2d at 185. The record contains no indication that Privette had any involvement in the A-Town Jewelz transaction aside from accompanying Smith while he engaged in an apparently legitimate transaction at that location. Beyond that we must rely on conjecture and surmise to

---

10. The trial court denied Privette's dismissal motion based on "his comment to his wife on the telephone call." We do not believe that this conversation, in which Privette reacted adversely to Ms. Cabbagestalk-Privette's reference to the "rings," supports a reasonable inference that Privette possessed stolen rings. At most, the evidence tends to indicate that the subject of "rings" had some sensitivity for Privette, not that he possessed any of the rings taken from Perry Brothers.

establish constructive possession, an approach that we rejected in *Minor*. As a result, we conclude that the record does not contain sufficient evidence to show that Privette had the "intent and capability to maintain control and dominion" over the stolen rings, so that the trial court erred by denying Privette's motion to dismiss the felonious possession of stolen property charge.[11] *Phillips*, 172 N.C. App. at 146, 615 S.E.2d at 883.

## 2. Jury Instructions Concerning Extortion-Related Charges

[5] At the conclusion of all of the evidence, the trial court instructed the jury, consistently with N.C.P.I.-Crim. 14-118.4, that the jury should convict Privette of extortion in the event that it found beyond a reasonable doubt that:

> First, that the defendant communicated a threat to the victim. Threatening physical violence is a threat; Second, that the defendant did this with the intent to obtain an avoidance of criminal prosecution. This avoidance of criminal prosecution is an advantage; And third, that the defendant intended to obtain avoidance of a criminal prosecution wrongfully—that is, knowing that he was not entitled to obtain it in this manner. If you find from the evidence beyond a reasonable doubt that on or about the alleged date, the defendant threatened the victim by threatening physical violence with the intent to obtain an advantage wrongfully, it would be your duty to return a verdict of guilty.

According to Privette, the trial court's instruction materially misstated the applicable law. We do not find this argument persuasive.

In his brief, Privette acknowledges that he did not object to the challenged instruction at trial. Ordinarily, the absence of such an objection would limit our review to determining whether "plain error" had occurred. *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996). However, Privette contends that his claim is not subject to "plain error" review because "the North Carolina Supreme Court has recognized an exception for [claims] that a defendant's constitutional right to a unanimous jury verdict has been violated." *State v. Haddock*, 191 N.C. App. 474, 478-79, 664 S.E.2d 339, 343 (2008) (citation omitted). Although we question whether Privette's challenge to the trial court's extortion-related instruction does, in fact, involve an

---

11. In light of our holding with respect to the "possession" issue, we need not address Privette's other challenges to his conviction for felonious possession of stolen property.

alleged violation of Article I, Section 24 of the North Carolina Constitution, we need not resolve that issue since Privette is not entitled to relief based on this claim under a *"de novo"* standard of review.

N.C. Gen. Stat. § 14-118.4 provides, in pertinent part, that a person is guilty of extortion if that person "threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or immunity . . . ." "Extortion may be defined as wrongfully obtaining anything of value from another by threat, duress, or coercion." *Harris v. NCNB Nat. Bank of North Carolina,* 85 N.C. App. 669, 675, 355 S.E.2d 838, 843 (1987) (citing *Black's Law Dictionary* 696 (rev. 4th ed. 1968)). According to Privette, the plain language of N.C. Gen. Stat. § 14-118.4 establishes that the term "wrongfully" modifies "to obtain anything of value or any acquittance, advantage or immunity," so that an individual accused of extortion is not guilty if he believes that he is entitled to the "value" or "acquittance, advantage, or immunity" that he seeks to obtain. In Privette's view, the trial court's instructions impermissibly changed the focus from the wrongfulness of the end which he allegedly sought to achieve to the wrongfulness of the manner in which he allegedly sought to obtain it.

As we stated in *State v. Greenspan,* 92 N.C. App. 563, 568, 374 S.E.2d 884, 887 (1989), "[t]he wrongful intent required by the [extortion] statute refers to the obtaining of the property and not to the threat itself." The defendant in *Greenspan* was convicted of extortion based on evidence that he had informed the victim that he would not press charges against the victim for placing harassing phone calls if the victim gave him money. *Id.* at 564-65, 374 S.E.2d at 885-86. On appeal, the defendant challenged the sufficiency of the evidence to support his conviction on the grounds that the record failed to establish the necessary intent given that the victim had, in fact, made harassing phone calls, thereby entitling him to the money which he sought. *Id.* at 568, 374 S.E.2d at 887. This Court, however, rejected the defendant's argument on the grounds that the wrongful intent required by the statute referred to the obtaining of property rather than to the threat itself. *Id.* In the course of our analysis, we recognized that there was a split of authority with respect to the "claim of right" issue and noted that, in the absence of a statutory provision authorizing the assertion of such a defense, most jurisdictions had declined to recognize it. *Id.* at 568-69, 374 S.E.2d at 887-88. We did not, however, decide whether the defendant's belief that he was entitled to the "value" that he sought was a defense to extortion, since we

upheld the defendant's conviction on the grounds that he had no established right to obtain the amount of money he demanded. *Id.* at 569, 374 S.E.2d at 888. As a result of the fact that we did not explicitly resolve the "claim of right" issue in *Greenspan*, we must now decide whether, by using the phrase "with the intention thereby wrongfully to obtain," the General Assembly intended that a person could be convicted of extortion for threatening or communicating a threat based on a belief that he was entitled to the value, acquittance, advantage, or immunity that he sought to obtain.

"The principal goal of statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citation omitted). "The best indicia of that intent are the language of the statute[,] . . . the spirit of the act and what the act seeks to accomplish." *Concrete Co. v. Board Of Commissioners*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (citation omitted). "If the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) (citation omitted).

> When construing an ambiguous criminal statute, we must apply the rule of lenity, which requires us to strictly construe the statute in favor of the defendant. "However, this [rule] does not require that words be given their narrowest or most strained possible meaning. A criminal statute is still construed utilizing 'common sense' and legislative intent."

*State v. Conway*, 194 N.C. App. 73, 79, 669 S.E.2d 40, 44 (2008) (internal citation omitted and quoting *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005)), *disc. review denied*, 363 N.C. 132, 673 S.E.2d 665 (2009). "Where possible, statutes should be given a construction which, when practically applied, will tend to suppress the evil which the Legislature intended to prevent." *In re Hardy*, 294 N.C. 90, 96, 240 S.E.2d 367, 372 (1978).

The key words in N.C. Gen. Stat. § 14-118.4 are "wrongfully" and "obtain." "Nothing else appearing, the legislature is presumed to have used the words of a statute to convey their natural and ordinary meaning." *Wood v. Stevens & Co.*, 297 N.C. 636, 643, 256 S.E.2d 692, 697 (1979) (citations omitted). "In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute." *Perkins v. Arkansas Trucking Servs., Inc.*, 351 N.C. 634, 638, 528 S.E.2d 902, 904 (2000). "Wrongful"

has been defined as "1. [c]haracterized by unfairness or injustice . . . [or] 2. [c]ontrary to law; unlawful . . . ." *Black's Law Dictionary* 1606 (7th ed. 1999). Put another way, "wrongful" means "wrong or unjust . . . [or] having no legal sanction[.]" *Webster's Ninth New Collegiate Dictionary* 1363 (9th ed. 1991). Similarly, "obtain" has been defined as "to hold on to, possess, [or] obtain . . . [or] to gain or attain [usually] by planned action or effort[.]" *Webster's Ninth New Collegiate Dictionary* 816 (9th ed. 1991). As a result, if the "wrongful intent required by the [extortion] statute refers to the obtaining of [the] property . . . ," *Greenspan*, 92 N.C. App. at 568, 374 S.E.2d at 887, then, in order for a defendant to wrongfully obtain property, we believe that a conviction for violating N.C. Gen. Stat. § 14-118.4 must necessarily involve an effort by an individual to attain property or some other acquittance, advantage, or immunity in an unlawful and unjust manner.

Such a construction of N.C. Gen. Stat. § 14-118.4, which rests upon the literal language utilized by the General Assembly, is consistent with the basic purpose sought to be achieved by the enactment of the relevant statutory provision. The word "extort" has been defined as "obtain[ing] from a person by force, intimidation, or undue or illegal power[.]" *Webster's Ninth New Collegiate Dictionary* 440 (9th ed. 1991). Similarly, *Black's Law Dictionary* 605 (7th ed. 1999) defines extortion as "the act or practice of obtaining something or compelling some action by illegal means, as by force or coercion." Based upon our reading of these definitions, we believe that the evil sought to be suppressed by the enactment of N.C. Gen. Stat. § 14-118.4 is the obtaining of property by unlawful or unjust means, so that an individual may commit extortion when he is seeking to obtain something to which he may be entitled in an unlawful or unjust manner as well as when he seeks something that he is not entitled to obtain.

Finally, we do not believe that the General Assembly intended that those with a reasonable claim of entitlement to the property which they seek to obtain would be exempt from the strictures of N.C. Gen. Stat. § 14-118.4. In the event that we were to adopt the construction of the relevant statutory language espoused by Privette, then an individual with a reasonable belief of entitlement to property would be free to threaten to engage in any type of violent conduct, including murder, in order to obtain that property without any risk of being convicted of extortion. Adopting such an interpretation of the relevant statutory language, under which the same conduct might or might not be sufficient to support a guilty verdict depending solely on the legitimacy of the ends sought to be achieved, would be inconsis-

tent with the result that we believe the General Assembly sought to achieve by enacting N.C. Gen. Stat. § 14-118.4. A decision to reach a contrary result would effectively authorize an unlimited right of self-help dispute resolution in which the legitimacy of the ends justified the means as long as the means in question did not constitute a separate criminal offense.

As a result, we conclude that North Carolina does not recognize a "claim of right" defense in extortion-related cases. Instead, we construe the relevant statutory language to require proof that the defendant intentionally utilized unjust or unlawful means in attempting to obtain the property or other acquittance, advantage, or immunity that he seeks instead of requiring proof that the defendant sought to achieve an end to which he had no entitlement. After careful review, we further conclude that the trial court's extortion-related jury instructions, which required the jury to find that Privette "intended to obtain avoidance of a criminal prosecution wrongfully—that is, knowing that he was not entitled to obtain it in this manner," are fully consistent with a proper interpretation of N.C. Gen. Stat. § 14-118.4.

In seeking to persuade us to reach a different result, Privette appears to contend that the State should have charged him with communicating threats instead of extortion. *See State v. Cunningham*, 344 N.C. 341, 360-61, 474 S.E.2d 772, 781 (1996) (stating that the elements of the crime of communicating threats are "[(1)] the defendant threatened a person; [(2)] the defendant communicated a threat to that person; [(3)] the defendant made the threat in such a manner and under such circumstances that a reasonable person would believe the threat was likely to be carried out; and [(4)] the person threatened believed that the threat was likely to be carried out"). We do not find this argument persuasive. As we see it, there is an important difference between the crime of extortion and the crime of communicating threats, with the former focused on threats made for the purpose of wrongfully obtaining something of value or an acquittance, advantage, or immunity and the latter focused more on threats of a general nature. As a result of the fact that Privette allegedly acted for the purpose of obtaining an acquittance, advantage or immunity, he was appropriately charged with violating N.C. Gen. Stat. § 14-118.4. Thus, Privette is not entitled to relief from the trial court's judgment based on his challenge to the trial court's extortion-based instruction.

### 3. Sufficiency of the Evidence of Extortion-Related Crimes

[6] Thirdly, Privette contends that the trial court erred by denying his motion to dismiss the extortion and conspiracy to commit extortion charges. In essence, Privette contends that the evidence received at trial did not suffice to support a finding that he knew that he was not entitled to seek to avoid criminal prosecution by threatening Mr. Lynn. We do not find this argument persuasive.

As we have already noted, N.C. Gen. Stat. § 14-118.4 provides, in pertinent part, that a person is guilty of extortion if he "threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or immunity[.]" "A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means." *State v. Bindyke*, 288 N.C. 608, 615, 220 S.E.2d 521, 526 (1975) (citation omitted). "To hold a defendant liable for the substantive crime of conspiracy, the State must prove an agreement to perform every element of the crime." *State v. Suggs*, 117 N.C. App. 654, 661, 453 S.E.2d 211, 215 (1995).

The evidence presented at trial tended to show that Privette sent messages to Mr. Lynn through Ms. Cabbagestalk-Privette to the effect that Mr. Lynn would be killed or assaulted if he did not turn himself in to authorities for committing the Perry Brothers robbery. Ms. Cabbagestalk-Privette indicated that she had given these messages to Mr. Lynn and had relayed Mr. Lynn's responses to Privette. Mr. Lynn subsequently turned himself in to authorities and confessed to having committed the Perry Brothers robbery even though he was not suspected of having participated in that crime. When this evidence is considered in the light most favorable to the State, it permits a reasonable juror to determine that Privette wrongfully threatened Mr. Lynn with death or serious injury in order to gain his release from imprisonment and the dismissal of criminal charges. As a result, the trial court correctly denied Privette's dismissal motion.

### 4. Admission of Gang-Related Testimony

Fourth, Privette contends that the trial court erred by admitting evidence concerning his alleged gang involvement, tattoos, and an 11 June 2009 telephone conversation with his wife. Privette's arguments have merit, at least in part.

At trial, the State contended that Privette was a "102," "original gangster," or "OG," which meant that he held high rank in the Bloods,

and that he utilized his gang-related status to "g[i]ve orders" to Smith, Mr. Lynn, and Mr. Marsh relating to the underlying crimes. Prior to trial, the trial court decided to allow testimony concerning "general things . . . with respect to ranks" and to exclude any testimony about the attainment of gang rank through violence or the development of a criminal record. At trial, over Privette's objection, Officer Mendez was allowed to testify about the history and organization of the Bloods, which was formed in a New York detention facility, and identifying the Bloods subsets located in Raleigh. In addition, Officer Mendez testified, over objection, that one Bloods subset is "more violent" and that another is about "sex, making money and committing murders." Moreover, Officer Mendez testified that a gang member identified as a "102," an "original gangster," or "OG" is a higher-ranking gang member and that a "higher-ranking gang member tells a lower-ranking gang member what to do." Officer Mendez described, without objection, gang-related symbols employed by the Bloods, including the fact that "the Bloods use a five[-pointed] star [representing] [the] . . . [f]ive principles within the nation" and that "[a]nother common symbol is a dog paw, and it's three circular burn marks, usually on the right side of the body." The trial court admitted, over objection, nine photographs of Privette's tattoos, only one of which was published to the jury, and allowed Officer Mendez to describe certain tattoos and their relation to Bloods symbology. According to Officer Mendez, a photograph of Privette's back showed that:

> There is a five-pointed star right here (indicating) with some wings on it. That would represent the five principles of Blood. There's also a five-pointed crown here . . . with the three circular marks which would be consistent with the dog paw. Obviously, right here, there's a big number five which would represent the five principles of Blood. There's east side right here. And then down here is kind of difficult to see, but there's [an] O, G right here, and then right here says status. The only other [tattoo] of significan[ce] would be this C73, which like I said before, that was the specific block within Rikers Island that United Blood Nation was created.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. Generally, all relevant evidence is admissible, N.C. Gen. Stat. § 8C-1, Rule 402, but evidence that has

"not been connected to the crime charged and which [has] no logical tendency to prove any fact in issue [is] irrelevant and inadmissible." *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228-29 (1991), *appeal dismissed and disc. review denied*, 331 N.C. 290, 416 S.E.2d 398, *cert. denied*, 506 U.S. 915, 113 S. Ct. 321, 121 L. Ed. 2d 241 (1992). N.C. Gen. Stat. § 8C-1, Rule 404(b), which is a specialized relevance rule, provides, in pertinent part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, such "other crimes" evidence may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C-1, Rule 404(b). According to well-established North Carolina law, N.C. Gen. Stat. § 8C-1, Rule 404(b) is a "rule of *inclusion* . . . subject to but *one exception* requiring exclusion [of evidence] if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." N.C. Gen. Stat. § 8C-1, Rule 403. "[T]he appropriate standard of review for a trial court's ruling on [relevancy-related issues] is not as deferential as the abuse of discretion standard which applies to rulings made pursuant to Rule 403." *Dunn v. Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (internal quotation marks and citation omitted).

### a. Evidence of Gang History and Gang Behavior

[7] First, Privette contends that the trial court erred by admitting Officer Mendez's testimony concerning the history of the Bloods and the activities of various Bloods subsets. We believe that this argument has merit.

Evidence of gang membership is generally inadmissible unless it is relevant to the issue of guilt. *State v. Freeman*, 313 N.C. 539, 547-48, 330 S.E.2d 465, 472-73 (1985). After carefully reviewing the record, we are unable to determine how the evidence concerning the history of the Bloods and the proclivities of various Bloods subsets has any bearing on the issue of Privette's guilt of the crimes with which he had been charged since this evidence "does not tend 'to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

the evidence.' " *Gayton*, 185 N.C. App. at 125, 648 S.E.2d at 278 (quoting N.C. Gen. Stat. § 8C–1, Rule 401). The only effect of the trial court's decision to allow the admission of this evidence was to depict a "violent" gang subculture of which Privette was a part and to impermissibly portray Privette as having acted in accordance with gang-related proclivities. *See Gayton*, 185 N.C. App. at 125, 648 S.E.2d at 278 (holding that the trial court erred by admitting gang-related evidence where "the only probative value the information had . . . was to portray defendant as a gang member"); *see also United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991) (holding that the trial court erred by allowing testimony regarding the gang's "institutional criminality" and involvement in drug manufacturing and distribution, even though the defendant was involved in such activities, because that evidence was "inherently and unfairly prejudicial" and tended to "deflect [] the jury's attention from the immediate charges and cause [] it to prejudge a person with a disreputable past . . ."). As a result, the trial court erred by admitting testimony concerning the history of the Bloods and the activities in which various Bloods subsets tended to engage.

## b. "Hierarchy and Rank" Evidence

[8] Secondly, Privette challenges the trial court's decision to admit Officer Mendez's testimony concerning "the hierarchy of [] gang structure." We believe, however, that evidence tending to show Privette's position in the local Bloods hierarchy was relevant to the extortion-related charges that had been lodged against him by shedding light on the relationship between Privette and Mr. Lynn.[12] *See Freeman*, 313 N.C. at 547-48, 330 S.E.2d at 472-73. Simply put, evidence as to Privette's higher rank within the Bloods hierarchy helped explain Privette's reason for believing that he could induce Mr. Lynn to confess to the Perry Brothers robbery, placed into context his statements that Mr. Lynn was "food" and would be "rolled" if he did not turn himself in, and helped explain Mr. Lynn's decision to turn himself in and confess his involvement in the Perry Brothers robbery when he was not suspected of having any involvement in the commission of that crime. *See State v. Arnold*, 284 N.C. 41, 47, 199 S.E.2d 423, 427 (1973) (stating that "evidence is . . . relevant if it is one of the circumstances surrounding the parties, and necessary to be known, to properly understand their conduct or motives, or if it reasonably

---

12. We need not address the extent to which this "hierarchy and rank" evidence was relevant to the possession of stolen property charge given our decision to reverse Privette's conviction for committing that offense.

allows the jury to draw an inference as to a disputed fact"). In addition, we cannot conclude that the trial court erred by admitting the "hierarchy and rank" testimony given its obvious relevance to the extortion-related crimes that Privette was charged with committing. As a result, the trial court did not err by admitting Officer Mendez's testimony concerning Privette's place in the Bloods hierarchy.

### c. Defendant Privette's Tattoos[13]

**[9]** Thirdly, Privette contends that the trial court erred by admitting photographs of his tattoos and related testimony describing the relationship between certain of these particular tattoos and Bloods symbology. This argument lacks merit.

In describing a photograph of Privette's back, Officer Mendez indicated that Privette had the letters "O" and "G" tattooed on his lower back, with the word "status" appearing directly below those two letters. Although evidence concerning a defendant's gang tattoos or other similar "body art" is irrelevant in the absence of evidence tending to show a connection between gang activity and the crime with which a defendant has been charged, *Hope*, 189 N.C. App. at 316-17, 657 S.E.2d at 913-14 (holding that testimony concerning a defendant's gang tattoos and "burn marks" was irrelevant given the absence of any evidence that the underlying crime was gang-related), we have already determined that the "hierarchy and rank" evidence presented by Officer Mendez was relevant to the issue of Privette's guilt of committing extortion-related offenses and conclude that photographic evidence depicting Privette's rank within the Bloods was relevant as well. Simply put, evidence tending to show that Privette was an "OG" cast light on Privette's comments that Mr. Lynn was "food" and would be "rolled" if he did not turn himself in and on Mr. Lynn's decision to do as Privette ordered. *See Arnold*, 284 N.C. at 47-48, 199 S.E.2d at 427-28. Moreover, for the reasons set forth with respect to the "hierarchy and rank" evidence, we conclude that the prejudicial effect of this photograph and related testimony was not so great as to compel its exclusion pursuant to N.C. Gen. Stat. § 8C-1,

13. As we have already noted, the only photograph of Privette's tattoos that appears to have been exhibited to the jury depicted Privette's back. In his brief, Privette advances arguments concerning a number of photographs, including a photograph of Privette's arm depicting a skull with "living, human eyes" surrounded by the "smoking barrel of a semi-automatic handgun," about which no testimony was offered and which were never published to the jury. As a result of the fact that these other photographs were never described in oral testimony or published to the jury, we are unable to see how any ruling that the trial court might have made with respect to these photographs could have prejudiced Privette.

Rule 403. As a result, the trial court did not err by allowing the challenged photograph to be admitted into evidence and published to the jury.

### d. 11 June 2009 Telephone Conversation

**[10]** Finally, Privette contends that the trial court erred by admitting evidence concerning an 11 June 2009 telephone conversation between Privette and his wife. We find Privette's contention persuasive.

In the course of the 11 June 2009 telephone conversation, Ms. Cabbagestalk-Privette told Privette that, if she were a man, she would "give [Privette] a run for [his] money." In response, Privette described the violent acts he would commit on Ms. Cabbagestalk-Privette if she were a man and disrespected him, which included "knock[ing] [her] teeth down [her] throat," "stab[ing] [her] in [the] chest [three] times," and "pistol[] whipp[ing] [her] [for] [a]bout .45 [to] 50 minutes." Privette also told Ms. Cabbagestalk-Privette during this conversation that he "would've killed [her]." Finally, Privette stated that he had the respect of others because he had a reputation as someone that doesn't "play" and as having a "low tolerance when it come[s] to dealin[g] [with] men and their bulls—." Although the trial court initially determined that evidence of this conversation was irrelevant, it reversed its ruling after Privette's counsel inquired on cross-examination about whether Ms. Cabbagestalk-Privette was a member of the Bloods and whether Privette would have any authority over her on the grounds that Privette had "opened the door" to the admission of the telephone conversation and "all the threats . . . and acts of physical violence" discussed in it.

Admittedly, "[w]here · one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981) (citations omitted). Although Privette did open the door to the admission of evidence concerning the extent of his authority over Ms. Cabbagestalk-Privette, the description of the violent acts that Privette would commit against Ms. Cabbagestalk-Privette if she "were" a man who disrespected him did not have any bearing on the "authority" issue. On the contrary, Privette clearly indicated that he would engage in similar acts of violence against men who disrespected him regardless of whether those men had any gang affilia-

tion. In addition, Ms. Cabbagestalk-Privette did not belong to the class of people to whom Privette was directing these threats. Simply put, this conversation had no tendency to make the existence of Privette's authority, or lack thereof, over his wife more probable or less probable than would have been the case had the challenged evidence not been admitted. Instead, this evidence had little purpose other than to show Privette's violent propensities. "[A] defendant's threat against a third person has no probative value and serves no other purpose than to arouse prejudice and hostility on the part of the jury against the defendant." *State v. Franklin*, 327 N.C. 162, 177, 393 S.E.2d 781, 790 (1990) (holding that testimony to the effect that defendant threatened to kill a third party who had stolen from him was inadmissible because it served no purpose other than showing defendant's propensity for violence). Thus, the trial court erred by admitting evidence concerning the 11 June 2009 telephone conversation.

### 5. Prejudice

After careful consideration of the nature and scope of the trial court's evidentiary errors, we further conclude that Privette is entitled to a new trial on the extortion-related charges. At trial, Privette argued, in effect, that the jury should not convict him of extortion and conspiracy to commit extortion on the grounds that he was angry about having been falsely arrested and incarcerated for involvement in a robbery which he had no role in committing, that the language in which these statements were couched simply reflected the environment in which he lived and should not be understood as having any greater significance, and that the statements upon which the State relied did not reflect a genuine intent to harm anyone. Although the State certainly presented evidence from which a different inference could be drawn, we believe that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached" at trial. N.C. Gen. Stat. § 15A-1443(a). As a result, we conclude that Privette is entitled to a new trial in the extortion-related cases.[14]

### III. Conclusion

Thus, for the reasons set forth above, we find no error in the trial court's judgment relating to Smith. In addition, we conclude that Privette's conviction for possession of stolen property should be reversed and that Privette should receive a new trial in the extortion-

---

14. Having concluded that Privette is entitled to a new trial in the extortion-related cases, we need not address his challenge to the prosecutor's jury argument.

related cases. As a result, the trial court's judgment as to Smith should, and hereby does, remain undisturbed and the trial court's judgment against Privette in the felonious possession of stolen property case should be reversed, and Privette should receive a new trial in the extortion-related cases.

NO ERROR IN PART, REVERSED IN PART, REMANDED AND NEW TRIAL IN PART.

Judges STEPHENS and BEASLEY concur.